**Robert A. GEORGINE, et al., on behalf of themselves and others similarly situated, Plaintiffs,**

v.

**AMCHEM PRODUCTS, INC., et al., Defendants, and Third Party Plaintiffs,**

v.

**ADMIRAL INSURANCE COMPANY, et al., Third Party Defendants.**

Civ. A. No. 93–0215.

United States District Court, E.D. Pennsylvania.

Feb. 28, 1995.

See also, 878 F.Supp. 716.

William R. Hanlon, Wendy S. White, David Booth Beers, Elizabeth Runyon Geise, John D. Aldock, Shea & Gardner, Washington, DC, Edward Houff, Church & Houff, P.A., Baltimore, MD, John G. Gaul, Princeton, NJ, for defendants.

Charles B. Blakinger, R. Nicholas Gimbel, Michael T. Starczewski, Hoyle, Morris & Kerr, Philadelphia, PA, Theodore Voorhees, Jr., Lawrence J. Eisenstein, Rachel S. Kronowitz, Charles E. Buffon, Neil K. Roman, Russell H. Carpenter, Jr., Covington & Burling, Washington, DC, for third-party plaintiffs.

Michael E. McGilvery, Wright, Young & McGilvery, P.C., Plymouth Meeting, PA, for Admiral Ins. Co., third-party defendant.

Allan C. Molotsky, Post & Schell, P.C., Stephen F. Brock, Joseph G. Manta, Manta and Welge, Philadelphia, PA, Maryann C. Hayes, Donald B. Hilliker, Kathleen H. Klaus, Pope and John, Ltd., Chicago, IL, for Affiliated FM Ins. Co., et al., third-party defendants.

Norman L. Haase, Dunn, Haase, Sullivan, Mallon, Cherner & Broadt, Media, PA, R. Jeff Carlisle, Aaron L. Bowers, Lynberg & Watkins, Los Angeles, CA, for AIU Ins. Co., et al., third-party defendants.

Elit R. Felix, II, Margolis, Edelstein & Scherlis, Philadelphia, PA, for Allianz Ins. Co., et al., third-party defendants.

Walter H. Swayze, III, Liebert, Short & Hirshland, Philadelphia, PA, Virginia M. Vermillion, Philip J. McGuire, Gleason, McGuire & Shreffler, Chicago, IL, for Allstate Ins. Co., as successor to Northbrook Excess and Surplus Ins. Co. and Northbrook Ins. Co., et al., third-party defendants.

Philip L. Greenberg, John M. Fitzpatrick, James J. Rodgers, Dilworth, Paxon, Kalish and Kauffman, Philadelphia, PA, for American Bankers Ins. Co. of Florida, third-party defendant.

Joseph M. Oberlies, Connor and Weber, P.C., Philadelphia, PA, for American Centennial Ins. Co., third-party defendant.

Stephen J. Nolan, Nolan, Plumhoff and Williams, Chtd., Towson, MD, for plaintiffs Ambrose Vogt, Jr., et al.

Lawrence A. Nathanson, Wilson M. Brown, III, Drinker, Biddle & Reath, Phila-

delphia, PA, for American Motorists Ins. Co., et al., third-party defendants.

Stephen F. Brock, Joseph G. Manta, Manta and Welge, Thomas R. Newman, James H. Harrington, Christine L. Andreoli, Newman & Harrington, New York City, for American Re–Insurance Co., et al., third-party defendants.

Thomas C. Delorenzo, John S. Tucci, Jr., Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, Linda B. Foster, Neely & Player, Atlanta, GA, for Atlanta International Ins. Co., third-party defendant.

Dorothy T. Attwood, Jay M. Levin, Cozen and O'Connor, Philadelphia, PA, for C.E. Heath Compensation and Liability Ins. Co., as successor to Employers' Surplus Lines Ins. Co., third-party defendant.

Butler Buchanan, III, William H. Black, Jr., Hecker, Brown, Sherry and Johnson, Philadelphia, PA, for Centennial Ins. Co., third-party defendant.

David E. Sandel, Jr., White and Williams, Lawrence M. Silverman, Silverman, Coopersmith, Hillman & Frimmer, Philadelphia, PA, for Central Nat. Ins. Co. of Omaha, third-party defendant.

Mitchell S. Pinsly, Philadelphia, PA, Henry E. Hockeimer, Jr., Steven K. Davidson, Daniel Sauls, Steptoe & Johnson, Washington, DC, for City Ins. Co. et al., third-party defendants.

Bernd G. Heinze, Wilson, Elser, Moskowitz, Edelman & Dicker, Philadelphia, PA, for Colonia Versicherung Aktiengesellschaft et al., third-party defendants.

Robert R. Reeder, Cozen & O'Connor, Keith R. Dutill, Wendy G. Macy, John P. O'Dea, Lee A. Rosengard, Stephen C. Baker, Stradley, Ronon, Stevens & Young, Malvern, PA, Juliann J. Sum, Rodney L. Eshelman, Daniel M. Crawford, Russell Leibson, William Penner, Carroll, Burdick and Mc Donough, San Francisco, CA, for Columbia Cas. Co., third-party defendant.

Dorothy T. Attwood, Robert R. Reeder, Jay M. Levin, Cozen & O'Connor, Philadelphia, PA, for Commercial Union Ins. Co., as successor to Columbia Cas. Co., Employers Commercial Union Ins. Co., Employers Commercial Union Ins. Co. of America, and Employers' Liability Assurance Corp. Limited, et al., third-party defendants.

Thomas Richichi, Washington, DC, for Compagnie Europeenne de Reassurances, third-party defendant.

Daniel P. Lynch, Timby, Brown & Timby, Philadelphia, PA, Michael V. Corrigan, David A. Vann, Lyndon M. Tretter, Simpson, Thacher and Bartlett, New York City, for Constitution State Ins. Co. et al., third-party defendants.

Keith R. Dutill, Wendy G. Macy, John P. O'Dea, Lee A. Rosengard, Stradley, Ronon, Stevens & Young, Philadelphia, PA, Stephen C. Baker, Stradley, Ronon, Stevens & Young, Malvern, PA, Juliann J. Sum, Rodney L. Eshelman, Daniel M. Crawford, Russell Leibson, William Penner, Carroll, Burdick & McDonough, San Francisco, CA, for Continental Cas. Co., third-party defendant.

Jo Ann Burk, Cuyler, Burk & Matthews, Morristown, NJ, Michael J. Jones, Cuyler, Burk & Matthews, Parsippany, NJ, for Employers Mut. Cas. Co., third-party defendant.

Daniel P. Lynch, Timby, Brown & Timby, Philadelphia, PA, for Evanston Ins. Co., third-party defendant.

William P. Shelley, Cozen and O'Connor, Philadelphia, PA, for Federal Ins. Co., third-party defendant.

Donald P. Jacobs, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C., Short Hills, NJ, Marc I. Bressman, Budd, Larner, Gross, Rosenbaum, Greenberg and Sade, P.C., Cherry Hill, NJ, for General Reinsurance Corp., et al., third-party defendants.

Michael J. Geraghty, David D'Aloia, Sean R. Kelly, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, E. Timothy Poindexter, Law Offices of William W. Kimball, Philadelphia, PA, for Gibraltar Cas. Co., et al., third-party defendants.

Mary A. Lopatto, Le Boeuf, Lamb, Leiby & MacRae, Washington, DC, for Government Employees Ins. Co., et al., third-party defendants.

David E. Sandel, Jr., White and Williams, Philadelphia, PA, Justin J. McCarthy, Exton,

PA, Patrick J. Dwyer, Polstein, Ferrara & Dwyer, P.C., New York City, for Highlands Ins. Co., third-party defendant.

Wendy H. Koch, Rawle and Henderson, Philadelphia, PA, Kevin Barry McHugh, Carl H. Sword, Costello & Shea, New York City, for Houston General Ins. Co., third-party defendant.

Thomas C. Delorenzo, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Jefferson Ins. Co. of New York, third-party defendant.

Susan G. Fillichio, Kevin G. Costello, Sedgwick, Detert, Moran & Arnold, New York City, for La Preservatrice Fonciere Tiard, individually and as successor to La Fonciere Assurances Transports Accidents and La Preservatrice Le Secours, et al., third-party defendants.

Norman L. Haase, Dunn, Haase, Sullivan, Mallon, Cherner & Broadt, Media, PA, Aaron L. Bowers, Lynberg & Watkins, Los Angeles, CA, for Lexington Ins. Co., third-party defendant.

Rudolph Garcia, Saul, Ewing, Remick & Saul, Philadelphia, PA, Joseph L. Ruby, Thomas W. Brunner, William G. Miller, Samuel D. Walker, Antoinette M. Tease, Wiley, Rein and Fielding, Washington, DC, for Maryland Cas. Co., third-party defendant.

Allan C. Molotsky, Post & Schell, P.C., Philadelphia, PA, for Michigan Mut. Ins. Co., et al., third-party defendants.

Richard W. Yost, L'Abbate & Balkan, Philadelphia, PA, James W. Greene, Bromley, Greene & Walsh, Washington, DC, for National American Ins. Co. of California, as successor to the Stuyvesant Ins. Co. et al., third-party defendants.

Lawrence M. Silverman, Silverman, Coopersmith, Hillman & Frimmer, Philadelphia, PA, for Protective Nat. Ins. Co. of Omaha, third-party defendant.

Justin J. McCarthy, Patrick J. Dwyer, Polstein, Ferrara & Dwyer, P.C., New York City, for Ranger Ins. Co., third-party defendant.

Stephen P. Chawaga, Fitzpatrick and Tanker, Philadelphia, PA, Peter N. Hillman, Debra M. Patalkis, Chadbourne & Parke, New York City, Theresa W. Hajost, Chadbourne and Parke, Washington, DC, for Republic Ins. Co., third-party defendant.

Larry G. Cobb, Cobb, Raynor & Mandel, Bala Cynwyd, PA, Bethany K. Culp, Jeffrey J. Bouslog, Oppenheimer, Wolff & Donnelly, St. Paul, MN, for St. Paul Fire and Marine Ins. Co., individually and as successor to Birmingham Fire Ins. Co., et al., third-party defendants.

Lisa B. Zucker, German, Gallagher & Murtagh, Philadelphia, PA, David Holmes, Sheft & Sheft, Jersey City, NJ, for Stonewall Ins. Co., et al., third-party defendants.

Suzette D. Bonfiglio, Jubanyik, Varbalow, Tedesco, Shaw & Shaffer, Cherry Hill, NJ, for Sun Alliance and London Ins. PLC, third-party defendant.

Wendy H. Koch, Rawle and Henderson, Philadelphia, PA, for Tokio Marine & Fire Ins. Co., Ltd., third-party defendant.

Michael P. Shay, Shay, Santee & Kelhart, Bethlehem, PA, James J. Duane, III, Taylor, Anderson & Travers, Boston, MA, for Unigard Security Ins. Co., as successor to Unigard Mut. Ins. Co., third-party defendant.

R. Jeff Carlisle, Aaron L. Bowers, Lynberg & Watkins, Los Angeles, CA, for Lexington Ins. Co., Ltd., et al., third-party defendants.

Steven R. Waxman, Kleinbard, Bell & Brecker, Philadelphia, PA, Glenn Bowers, James W. Orr, Bowers, Orr & Robertson, Columbia, SC, for National Continental Ins. Co. as successor to American Star Ins. Co., third-party defendant.

Marc I. Bressman, Budd, Larner, Gross, Rosenbaum, Greenberg and Sade, P.C., Cherry Hill, NJ, for Reliance Ins. Co., third-party defendant.

Daniel J. Maher, Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, PA, for American Empire Surplus Lines Ins. Co. as authorized agent on behalf of Transport Indem. Co., third-party defendant.

## MEMORANDUM

LOWELL A. REED, Jr., District Judge.

Pending before me is the joint motion of the settling parties for an order establishing a second notice and opt-out period for class members who have requested exclusion from the class, in order to remedy improper communications by counsel opposing the settlement ("settling parties' joint motion") (Dkt. No. 807).[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the named parties are of diverse citizenship and the amount in controversy for each class member exceeds $50,000.[2] Although notices of appeal have been filed relating to this Court's August 16, 1994 Order and the September 21, 1994 preliminary injunction, this Court retains jurisdiction to decide the issues relating to a second opt-out period because the issues here are distinct from those addressed in the two prior matters. *See* discussion *infra* part II.A.

On October 14, 1994, after finding that the legal arguments and submissions of the parties were inadequate under the circumstances, this Court ordered additional briefing to resolve the present joint motion. Order, Dkt. No. 1235 (Oct. 14, 1994). The parties were asked to address various issues relating to the nature of the First Amendment interests at stake here, this Court's authority to control communications between counsel and members of the class, and the appropriate relief to remedy any injury. In addition, on that same day, this Court ordered certain counsel accused by movants of having disseminated misleading communications to submit a certification attesting to various background facts relating to the allegedly misleading communications. Order, Dkt. No. 1236 (Oct. 14, 1994).[3] Moreover, the settling parties were required to file a certification that set forth how many exclusion request forms were submitted on forms indicating that they were provided by lawyers opposed to the settlement. In essence, the settling parties were to update the preliminary data filed in the February 21, 1994 certification and the August 4, 1994 final notice report. *Id.*

Based upon the joint motion of the settling parties, the responses thereto, and for the reasons stated below, the joint motion shall be granted in part and denied in part.

## I. BACKGROUND[4]

On January 15, 1993, counsel for the plaintiff's class filed the complaint in this action

---

1. Memoranda in opposition to the motion of the settling parties have been filed by the Wiese Objectors *et al.*, Akins Objectors, Windsor Objectors, Maritime Asbestos Claimants, Adrian Elfenbaum, "Weitz plaintiffs," Jacobs & Crumplar, P.A. clients, class members represented by the Law Offices of Peter G. Angelos, and Dearborn and Butcher (collectively "Objectors"). In addition, a memorandum in response to the motion of the settling parties has been filed by the Director of the Office of Workers' Compensation Programs, United States Department of Labor.

2. *See Carlough v. Amchem Products, Inc.*, 834 F.Supp. 1437 (E.D.Pa.1993).

3. On November 14, 1994, after receipt of four certifications that failed to comply with the terms of the October 14, 1994 Order because they inaccurately and inadequately asserted that the information requested was protected by the attorney-client privilege, this Court ordered that the authors of those certifications file a new certification providing the requested information. Specifically, this Court found that the information requested in subparagraph (a) of the October 14, 1994 Order was not protected by the attorney-client privilege. Order, Dkt. No. 1321 (Nov. 14, 1994). The November 14, 1994 Order also provided that if an attorney claimed that the use of a document, letter or notice was prohibited by the attorney-client privilege, then the attorney should file a sworn affidavit establishing each element of that privilege. No attorneys filed any affidavits in response to the November 14, 1994 Order which established that such a privilege existed. Moreover, the November 14, 1994 Order also required the authors of the four certifications to file under seal a copy of any communications that they disseminated that were similar to the communications at issue in the settling parties' joint motion. Again, if an attorney sought protection from the attorney-client privilege, that attorney was ordered to file the similar communication under seal and to submit an affidavit establishing that each element of the attorney-client privilege was met. Only Michael P. Cascino filed any documents under seal, however, his affidavit failed to demonstrate that the elements of the attorney-client privilege had been met. Affidavit of Michael P. Cascino, Dkt. No. 1351 (Dec. 2, 1994).

4. For a more extensive discussion of the history of this litigation, see *Georgine v. Amchem Products, Inc.*, 157 F.R.D. 246, 257–61 (E.D.Pa.1994).

along with motions for class certification and for approval of a settlement agreement between all named plaintiffs and defendants.[5] On that same day, the CCR defendants[6] filed an answer. On January 29, 1993, the Honorable Charles R. Weiner conditionally certified an opt-out class consisting of:

1. All persons (or their legal representatives) who have been exposed in the United States or its territories (or while working aboard U.S. military, merchant or passenger ships), either occupationally or through occupational exposure of a spouse or household member, to asbestos or to asbestos containing products for which one or more of the defendants may bear legal liability and who, as of January 15, 1993, reside in the United States or its territories, and who have not, as of January 15, 1993, filed a lawsuit for asbestos-related personal injury or damage, or death in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendants(s) bear legal liability).

2. All spouses, parents, children, and other relatives (or their legal representatives) of the class members described in paragraph 1 above who have not, as of January 15, 1993, filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph 1 above in any state or federal court against the defendant(s) (or against entities for whose actions or omissions the defendant(s) bear legal liability).

Judge Weiner assigned to me the task of conducting fairness proceedings and of determining whether the proposed stipulation of settlement ("Stipulation") is fair to the class pursuant to Fed.R.Civ.P. 23(e). Order, Dkt. No. 12 (Jan. 29, 1993).

On October 27, 1993, after extensive briefing and oral argument, this Court ruled that the notice plan submitted to the Court by the settling parties was adequate and comported with due process and ordered the dissemination of the notice pursuant to the plan. *Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 332–34, 336 (E.D.Pa.1993). Notice was disseminated commencing on November 1, 1993 and continued for eight weeks. Class members were given the opportunity to exclude themselves from the class by filing a timely exclusion request form on or before January 24, 1994, at which time the opt-out period closed. A timely exclusion request was a document, signed by an individual class member, postmarked on or before January 24, 1994, which provided a reasonable indication of the individual's desire to opt out. In addition, the CCR defendants have agreed to treat lawsuits filed prior to January 24, 1994 as timely exclusion requests and this Court accepts that determination. A total of 236,-323 timely exclusion requests were received by the CCR and less than 5% were on the original forms included in the Court-approved notice packets and the other 95% apparently were supplied by counsel or third persons. *See* Certification of Michael F. Rooney, attached to notice of filing of certification, Dkt. No. 1304 (Nov. 8, 1994) at ¶ 7.

On August 16, 1994, after discovery and a full evidentiary hearing on the issue of fairness, this Court ruled that the Stipulation was fair to the class as a whole; that the class had been adequately and ethically represented by class counsel throughout the negotiations and the subsequent proceedings; and that notice to the class complied with Fed.R.Civ.P. 23 and the Due Process Clause. *See Georgine*, 157 F.R.D. at 337–38. Accordingly, this Court approved the Stipulation as

---

5. The complaint seeks compensation related to claimed injury or death of its members due to alleged occupational exposure to asbestos or asbestos products supplied by the defendants. The plaintiffs seek compensatory and punitive damages on the following legal theories: (1) negligent failure to warn, (2) strict liability, (3) breach of express and implied warranty, (4) negligent infliction of emotional distress, (5) enhanced risk of disease, (6) medical monitoring, and (7) civil conspiracy. Complaint, Dkt. No. 1 (Jan. 15, 1993) at 18–27.

6. The CCR defendants are: Amchem Products, Inc., A.P. Green Industries, Inc., Armstrong World Industries, Inc., the Asbestos Claims Management Corp. (formerly National Gypsum Company), Certainteed Corporation, C.E. Thurston and Sons, Inc., Dana Corp., Ferodo America, Inc., Flexitallic, Inc., GAF Corp., I.U. North America, Inc., Maremont Corp., National Service Industries, Inc., Nosroc Corp., Pfizer Inc., Quigley Company, Inc., Shook & Fletcher Insulation Company, T & N plc, Union Carbide Corp., United States Gypsum Company.

fair and finally certified the opt-out settlement class.

## II. DISCUSSION

### A. Jurisdiction

This Court has jurisdiction to resolve the joint motion of the settling parties, regardless of the filing of the notices of appeal relating to this Court's August 16, 1994 Order or the September 21, 1994 preliminary injunction, as amended by this Court's September 29, 1994 Order (collectively "September 21, 1994 preliminary injunction").[7] *See Georgine v. Amchem Products, Inc.,* 878 F.Supp. 716 (E.D.Pa.1994). Simply, because the issues involved in the two prior matters are different from those at issue here, the filing of the notices does not divest this Court of jurisdiction to decide the present motion.

The notices of appeal relating to this Court's August 16, 1994 Order and September 21, 1994 preliminary injunction indicate that the parties have challenged the injunctive effect of those orders and, therefore, they are appeals filed pursuant to 28 U.S.C.A. § 1292(a)(1) (West 1993).[8] *See Oliver v. Kalamazoo Board of Education,* 640 F.2d 782, 786 (6th Cir.1980). "As a general rule, the timely filing of a notice of appeal is an event of jurisdictional significance, immediately conferring jurisdiction on a Court of Appeals and divesting a district court of its control over those aspects of the case involved in the appeal." *Venen v. Sweet,* 758 F.2d 117, 120 (3d Cir.1985); *Taylor v. Sterrett,* 640 F.2d 663 (5th Cir. Unit A.1981) ("[W]here an appeal is allowed from an interlocutory order, the district court may still proceed with matters not involved in the appeal."); *see Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 379, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985) (same); *Weaver v. University of Cincinnati,* 970 F.2d 1523, 1528 (6th Cir.1992), *cert. denied, Weaver v. Steger,* —— U.S. ——,

113 S.Ct. 1274, 122 L.Ed.2d 668 (1993) (same); *United States v. Price,* 688 F.2d 204, 215 (3d Cir.1982) (same); *United States v. City of Chicago,* 534 F.2d 708, 711–12 (7th Cir.1976) (same); *TeleBrands Direct Response Corp. v. Ovation Communications, Inc.,* 802 F.Supp. 1169, 1174 (D.N.J.1992) (same); *Queens Decorative Wallcoverings, Inc. v. Parati,* 711 F.Supp. 254, 255 (E.D.Pa. 1989) (notice of appeal divests court of power to consider the *motion* ); *United Parcel Service, Inc. v. United States Postal Service,* 475 F.Supp. 1158, 1161 (E.D.Pa.1979) (noting that where appeal is taken pursuant to 28 U.S.C. 1292(a)(1) exception to general rule applies); *Sycuan Band of Mission Indians v. Roache,* 788 F.Supp. 1498, 1511 (S.D.Cal. 1992), *aff'd,* 38 F.3d 402 (1994) (same); *Macon v. Bailar,* 428 F.Supp. 182, 183–85 (E.D.Va.1977) (discussion of background of 28 U.S.C. § 1292(a)). The general rule is a judge-made creation that is grounded upon prudential considerations. *See Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 97 (3d Cir.1988). Its purpose is to prevent the confusion and inefficiency which would result were two courts to be considering the same issue or issues simultaneously. *Venen,* 758 F.2d at 121; *see Bensalem Township v. International Surplus Lines Ins. Co.,* 38 F.3d 1303, 1314 (3d Cir.1994). "As a prudential doctrine, the rule should not be applied when to do so would defeat its purpose of achieving judicial economy." *Lingle,* 847 F.2d at 97.

In the instant case, the issues before the Court of Appeals relating to the August 16, 1994 Order and the September 21, 1994 preliminary injunction bear little relation to those at issue here. *See Philadelphia Newspapers, Inc. v. Newspaper & Magazine Employees Union,* 647 F.Supp. 236, 250 (E.D.Pa. 1986) (matter before the court was not an issue on appeal so court not divested of jurisdiction); *Haas v. Pittsburgh National Bank,* 495 F.Supp. 815, 817 (W.D.Pa.1980). The

---

7. This Court's November 9, 1994 Order also was appealed. On January 20, 1995, the Court of Appeals for the Third Circuit dismissed the appeal finding that it did not have jurisdiction to hear the appeal under 28 U.S.C. § 1291. *See Georgine v. Amchem Products, Inc.,* 1994 WL 637404 (E.D.Pa. Nov. 10, 1994), *appeal dismissed,* 47 F.3d 1160 (3d Cir.1995).

8. Section 1292(a)(1) provides that "the courts of appeals shall have jurisdiction of appeals from ... [i]nterlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions." 28 U.S.C.A. § 1292(a)(1).

instant joint motion of the settling parties addresses the question of whether class members were subjected to misleading communications which likely caused them to opt out of the *Georgine* class. This issue has little relation to, nor effect on, the August 16, 1994 Order or the September 21, 1994 preliminary injunction.

■ The August 16, 1994 memorandum opinion addressed issues relating to the fairness of the *Georgine* settlement. *See Georgine*, 157 F.R.D. 246. Specifically, the August 16, 1994 memorandum opinion included an extensive analysis of the terms of the settlement, class certification, adequacy of class counsel and notice, and the general fairness of the Stipulation to class members. The only significant consideration of the number of individuals who opted out of the class was in the context of evaluating the "reaction of the class." *Id.* at 324–25. However, as I noted at that time, the "consideration [of the reaction of the class] is somewhat less important than the others this Court has already discussed. Thus, courts have approved settlements involving significant opposition within the class." *Id.* at 324. Accordingly, the issue here, that is, the appropriate number of individuals who opted out of the class, did not play an important role in this Court's decision in the August 16, 1994 memorandum opinion.

That the instant analysis would have little, if any, bearing on any decisions that were reached in that memorandum opinion is doubtless because granting the joint motion here could only mean that the class might be *larger.*[9] Indeed, if the class were larger in size, that fact would, if anything, further support my conclusion that the terms of the Stipulation were fair to class as a whole. *Id.* at 337. Simply, my decision to resolve the present joint motion creates no risk of confusion or inefficiency because the issues involved in the August 16, 1994 memorandum opinion are distinct from those here.

■ The appeal of the September 21, 1994 preliminary injunction also does not divest this Court of jurisdiction to hear the instant motion. As I noted in my November 9, 1994 memorandum opinion, "[t]he September 21, 1994 preliminary injunction addressed whether it was necessary in aid of this Court's jurisdiction to prevent individuals who had not opted out of the class from initiating or prosecuting asbestos-related claims against the CCR defendants." *Georgine*, 1994 WL 637404, at *5. I concluded that the injunction was necessary because suits by individuals who had not opted out of the *Georgine* class would "disrupt, undermine, or otherwise defeat the implementation of the Stipulation [of Settlement] now approved by this Court." *Georgine*, 878 F.Supp. at 722. The injunction was essential to preserve the viability of the class action and, therefore, was necessary in aid of this Court's jurisdiction. *Id.* at 724.

Here, the present motion has no relation to the matters addressed in the September 21, 1994 preliminary injunction. The preliminary injunction confronted the problems that would be created by individuals who failed to opt out of the *Georgine* class and who sought relief in another forum without the approval of this Court. Conversely, the focus of the analysis here is on those individuals who *excluded* themselves from the *Georgine* class, not those who did not opt out. In the instant case, the concern addressed is whether individuals who were exposed to allegedly misleading letters and advertisements might have or would have excluded themselves from the class but for their exposure to the misleading communications. The result of my decision here could only reduce the number of individuals filing actions in other fora and, therefore, further lighten the burden on the CCR defendants to defend themselves in multiple actions. In sum, the determination of the effects of the purportedly misleading communications on class members is a completely different matter than that which is on appeal in the September 21, 1994 preliminary

---

9. Properly then, the decision of the CCR defendants not to withdraw from this settlement because of excessive opt-outs will be unaffected by this memorandum opinion and order. Regardless of the number of individuals who decide to exclude themselves from the *Georgine* class for the second time, the CCR defendants will not be granted another opportunity to withdraw from the settlement based upon excessive opt-outs pursuant to Section XXI of the Stipulation.

injunction. *See Oliver,* 640 F.2d at 788 (in complex case, court recognized distinction between issues on appeal and those for which the district court maintained jurisdiction).

▪ I also find that retaining jurisdiction to resolve the instant motion would not cause harm or prejudice to any party. *See Silberman v. Bogle,* 486 F.Supp. 70, 73 (E.D.Pa. 1980); *Ore & Chemical Corp. v. Stinnes Interoil, Inc.,* 611 F.Supp. 237, 240 (S.D.N.Y. 1985). First, no party has requested that this Court refrain from resolving the present motion or even suggested any prejudice that could result from doing so. Second, I find that it is in the interests of class members and the CCR defendants to finally resolve the status of class members in the *Georgine* class. This case has been pending for over two years and these parties have a right to know how to proceed regarding the asbestos-related claims. Moreover, this Court has an interest in moving this case along to the issuance of final judgment. Accordingly, I conclude that this Court has jurisdiction to resolve the present joint motion.

## B. The Merits of the Joint Motion

The settling parties have filed the present joint motion requesting that this Court remedy the adverse effects of an allegedly massive campaign, launched by attorneys who oppose the settlement, to solicit opt-outs through purportedly misleading mass mailings and advertisements targeted to absent class members.[10] According to the settling parties, "the class members who have asked to be excluded from the settlement have done so without being able to make the informed, personal choice that both the notice provisions of Rule 23 and this Court's notice orders were designed to afford them." *See* settling parties' joint motion at 1. The settling parties seek, *inter alia,* the negation of all exclusion requests and the creation of a second notice and opt-out period for class members who timely requested exclusion from the class, and the issuance of an injunction requiring that all communications by asbestos plaintiffs' attorneys—that concern the class action or settlement and that are specifically directed at class members who filed timely exclusion requests—bear a "Disclosure Statement." *See* CCR defendants' supplemental memorandum in support of the motion for a second notice and opt-out period for class members who have requested exclusion from the class ("settling parties' supp. memo.") at 2–3.[11] Because I agree that it is likely that class members were deceived by letters and advertisements regarding the terms of the settlement, but do not agree that a disclosure statement is necessary to protect the interests of the settling parties or class members, I will grant the joint motion in part and deny it in part.

### 1. Injury

▪ District Courts have both the duty and broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981).

---

**10.** Indeed, it is class counsel who have a significant interest in ensuring that members of the class whom they represent have not excluded themselves from the class based upon inaccurate information.

**11.** While the settling parties originally sought an order banning any future misleading communications with class members during the second notice and opt-out period, the supplemental memorandum of the CCR defendants indicates that the CCR defendants have decided to "amend" the relief that they seek to require only that a disclosure statement be imposed. Settling parties' supp. memo. at 2–3. In a letter from class counsel regarding the issues raised by the settling parties' motion for a second opt-out period, class counsel indicated that they fully support actions the Court believes to be necessary to remedy the impact of any misleading or inaccurate statements concerning the class action. Class counsel state that they agree with any actions taken by the Court that are remedial in nature, for instance, dissemination of a new accurate notice and the establishment of a second opt-out period. Class counsel indicate, however, that while they support the requirement that communications contain a disclosure statement, they cannot support any order that would restrain attorney-client communications in any manner. Letter of Class Counsel Joseph F. Rice, Dkt. No. 1280 (Nov. 1, 1994). Accordingly, because the relief sought by class counsel is consistent with those expressed in the CCR defendants' supplemental memorandum, I will continue to consider the instant motion to be a "joint motion" brought by the "settling parties."

"Rule 23 specifically empowers district courts to issue orders to prevent abuse of the class action process." *In re School Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir.1988). This discretion is not unlimited, and is bounded by the Federal Rules of Civil Procedure. Because many of the advantages of a class action come at the cost of binding individual class members through the res judicata effects of litigation over which many lack control, Rule 23 offers eligible members of a class the right of exclusion from the class. *See Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1201 (11th Cir.1985). It is essential that class members' decisions to participate or to withdraw be made on the basis of independent analysis of their own self interest, and the vehicle for accomplishing this is the class notice. *See Impervious Paint Ind. v. Ashland Oil*, 508 F.Supp. 720, 723 (W.D.Ky.), *appeal dismissed without op.*, 659 F.2d 1081 (6th Cir.1981). Accordingly, it is essential that the district court closely monitor the notice process and take steps necessary to ensure that class members are informed of the opportunity to exclude themselves or to participate in the judgment. *Id.* at 1202; *see* Fed.R.Civ.P. 23(c)(2).

■ The notice disseminated to class members is "crucial" to the entire scheme of Rule 23. *See Kleiner*, 751 F.2d at 1202 ("In view of the tension between the preference for class adjudication and the individual autonomy afforded by exclusion, it is critical that the class receive accurate and impartial information regarding the status, purposes and effects of the class action."). Notice "sets forth an impartial recital of the subject matter of the suit, informs members that their rights are in litigation, and alerts them to take appropriate steps to make certain their individual interests are protected." *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir.1980); *Impervious Paint Ind.*, 508 F.Supp. at 723. "It is the responsibility of the court to direct the 'best notice practicable' to class members, Rule 23(c)(2), and to safeguard them from unauthorized,

misleading communications from the parties or their counsel." *Erhardt*, 629 F.2d at 846.

Misleading communications to class members concerning litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally. *In re School Asbestos Litigation*, 842 F.2d at 680. "Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." *Kleiner*, 751 F.2d at 1203. Here, I find that unilateral communications with class members by various attorneys were misleading and made it unlikely that class members, who received these communications or were informed of their contents, made an informed choice to exclude themselves from the class.

### (a) Misleading Communications

Various communications disseminated to class members by attorneys opposed to this settlement were, on their face, clearly materially false and misleading in several respects. Many of the letters and advertisements were misleading because they, (1) made statements regarding the terms of the settlement that created false impressions about the effect of the settlement on the recipient, *e.g.*, the false statement that opting out is the only way to secure future compensation; asbestos companies can back out of the settlement at any time; and (2) did not reveal the personal interests of the drafters of the letters and advertisements. Moreover, because these communications contained only one-sided attacks on the terms of the settlement without any discussion of the settlement benefits or the existence of the Court-approved notice materials, the effect of the misleading aspects of the communications was compounded.

■ Among the misleading communications sent to class members was a letter written by the law firm of Baron & Budd, one of the law firms that represents clients opposed to the class settlement.[12] *See* set-

---

12. Both Frederick Baron and Russell Budd have entered appearances for objectors in this matter and are counsel of record.

tling parties' joint motion, exhibit 2. This letter, which was sent to clients and individuals who were represented by other counsel, solicited class members to opt out of the class. *See* reply memorandum in support of the settling parties' joint motion for an order establishing a second notice and opt-out period for class members who requested exclusion from the class ("settling parties' reply"), exhibits 21, 22. Many of the misleading aspects of the Baron & Budd letter exemplify the problems which are pervasive in the deceptive letters and advertisements disseminated to class members by counsel opposed to this settlement.[13] *See* settling parties' joint motion, exhibit 2.

An examination of the Baron & Budd letter leads to the inescapable conclusion that it contains inaccuracies and is likely to create the impression that opting out of the class is the only way to secure future compensation for asbestos related injury. For example, the letter, which is brief, states that "[t]he only way to protect your rights to future compensation is to sign the enclosed 'opt out' form immediately" and that "[i]f you do not send in this form immediately, YOU WILL LOSE VALUABLE RIGHTS IN THE EVENT YOU DEVELOP AN ASBESTOS–RELATED DISEASE IN THE FUTURE." [14] *Id.* Although I recognize that some recipients of this letter may not qualify for compensation under the terms of the settlement, the letter does not explain the reasons why a recipient would not be eligible for benefits or that the person might qualify for benefits in the future under specified circumstances. In fact, the letter creates the impression to all readers, both those who will be eligible to receive compensation in the future and those who will not, that the only way to obtain future compensation is to sign the enclosed opt-out form. That simply is incorrect.[15]

Moreover, the effect of these forecasts of doom is heightened by the fact that the Baron & Budd letter does not explain that there are substantial benefits to the *Georgine* settlement and that compensation for asbestos-related disease is available in many respects under the terms of the Stipulation. The letter does not inform the reader that some advantages of the settlement are the elimination of the risk of having to prove liability, a negotiated settlement for cash sums due under the claims procedure or extraordinary claims procedure, security that funds will be available for future illnesses, and the availability of damages for pain and suffering after a claimant suffering from mesothelioma dies. *See* Stipulation, section VIII, at 57–57a. The letter also does not mention that a settlement had been proposed and would be implemented only if the Court concluded that it was fair to the class.[16]

13. On January 14, 1994, in response to the emergency motion of the CCR defendants regarding misleading communications with class members, I found that,

> "there is a substantial likelihood that the contents of the [Baron & Budd] letter may affect the number or significance of the opt-out decisions by the recipients thereof."

Order, Dkt. No. 628 (Jan. 14, 1994) at ¶ 6. I also reserved decision on whether the contents of the letter were significantly inaccurate, whether the letter violated Fed.R.Civ.P. 23, or whether the letter undermined the letter and spirit of the notice plan approved by this Court. Moreover, I ordered Mr. Baron to provide the settling parties with one copy of a list of the names and addresses of those to whom the letter in question was sent and a list of the names and addresses of those who had responded to the letter by returning the self-addressed stamped signed opt-out postcards which were enclosed with the letter. Finally, I ordered counsel for the settling parties and everyone subject to this Court's December 3, 1993 confidentiality order not to make any contact whatsoever with the persons named in the lists. *Id.;* Confid. Order, Dkt. No. 547 (Dec. 3, 1993).

14. Despite the claim by many of the Objectors to the contrary, statements like these, by failing to label them as such, do not express opinion, rather, they give the impression of stating fact.

15. The *settling parties claim, and Mr. Baron does not dispute,* that the lists provided by Mr. Baron indicate that the letter was sent to over 10,000 potential class members and that approximately half of those recipients returned opt-out postcards to Mr. Baron. *See also* Certification of Baron & Budd, P.C., Dkt. No. 1289 (Dec. 7, 1994).

16. The letter also inaccurately and inexplicably states that "several asbestos companies have filed a class action," when in fact the complaint in this action was filed by plaintiffs who were asbestos disease victims. *See* settling parties' joint motion, exhibit 2.

Perhaps the most disturbing aspect of the letter is that it fails to mention that Baron & Budd represents class members who are objecting to the settlement and, therefore, are not neutral observers.[17]

■ Many letters and advertisements were "deceptive" because they contained specific statements that were misleading, misrepresentations of fact or falsehoods. The possibility for deception is self-evident. For example, an advertisement published by the law firms of Shein, Johnson & Berezofsky, P.C. and Brookman, Rosenberg, Brown & Sandler stated that "[a]sbestos companies can back out of this proposed settlement at any time but victims are bound to its terms forever." Settling parties' joint motion, exhibit 16; see settling parties' joint motion, exhibit 17 (creating same impression in reader without use of words "at any time" and use of word "forever" not accurate if CCR withdraws from settlement). This statement is simply false because under the terms of the settlement, the CCR defendants are entitled to withdraw from the settlement on only two occasions. First, the CCR defendants had the right to withdraw at the close of the opt-out period if the CCR defendants determined that the number of individuals who had opted out was excessive. Stipulation, section XXI. Second, each CCR defendant has the right to withdraw from the settlement after ten years has passed from the settlement's effective date. Stipulation, section XXII. Therefore, to say that the asbestos companies can back out of the settlement at any time improperly creates the impression that class members are the only parties bound by the terms of the settlement. This view likely would cause a class member to consider opting out because any reasonable individual would be suspicious of an agreement that only binds one party. This advertisement appeared in the Philadelphia Daily News in December 1993 and January 1994. The newspaper is located in Philadelphia, Pennsylvania and has an approximate circulation of 195,000. It also was published in the Delaware County Times located in Primos, Pennsylvania that has an approximate circulation of 60,000. See certification of Rosenberg and Brookman, Dkt. No. 1299 (Nov. 7, 1994) at (b)(iii); certification of Shein, Dkt. No. 1285 (Nov. 4, 1994) at (b)(iii).[18]

■ At least one letter disseminated by a law firm provided information about the settlement that was blatantly false. See settling parties' joint motion, exhibit 5. The letter apparently was sent by the law offices of Michael P. Cascino, Ltd. and stated that, "If you do not exclude yourself, the *Carlough* defendants *will only pay* you approximately $6,500 if you were to develop lung cancer and only $20,000 if you develop mesothelioma." *Id.* (emphasis added). Although the letter represented that class members who develop lung cancer will only be paid $6,500, in fact, class members can elect to receive compensation under the Stipulation through three different payment procedures, all of which provide a *minimum* of $10,000 up to a possible

---

17. The letter is even more underhanded because it encourages recipients to make decisions to opt out of the class without the benefit of the Court-approved notice materials. The letter does not include a notice packet, alert the reader that the notice information is available, nor that a toll-free number could be used to obtain the relevant information. Moreover, Mr. Baron admitted that his firm did not send a list of potential class members to the settling parties so they could dispense notice packets to them, nor did Mr. Baron send out the 4,000 notice packages that were provided to him to send to his clients. Jan. 12, 1994 Hearing Transcript at pp. 35–36, 37.

The Baron & Budd firm was not the only law firm that did not disseminate the notice packet. All but two of the attorneys here who had had at least one case involving a CCR member were asked by the settling parties to give a confidential list of potential class members who would then be sent notice packets by the CCR, however, only one of the lawyers provided any assistance. The settling parties claim that neither the Baron & Budd firm, nor any of the other firms who disseminated misleading communications, supplied names and requested extra packets to aid in the dissemination of the notice package. See settling parties' joint motion at 7.

18. One letter to class members even asserted that the "[a]dvertisements of the CCR Asbestos Class Action spew and blare false propaganda through the media everywhere." Settling parties' joint motion, exhibit 10. This letter implies that even the Court-approved advertisements were also "propaganda."

$86,000 if lung cancer develops.[19]

The dollar figures in the aforementioned letter are even more misleading when one considers that the chances of receiving more than. the minimum value for each disease is likely. According to the terms of the settlement, if a class member develops lung cancer or mesothelioma and the class member elects the "individualized payment procedures," her compensation will *begin* at $10,000 or $20,-000, respectively. After consideration of such factors as the nature and extent of the asbestos disease, questions of medical causation, disability, age, number and age of dependents, special damages and pain and suffering, the claimant will be offered by the CCR defendants an amount between $10,-000–$86,000, and $20,000–$200,000, respectively. Stipulation, section VIII.B.2.b; Stipulation, exhibit B.[20] Accordingly, it is entirely misleading to state, with certainty, that individuals who develop lung cancer or mesothelioma will be paid only approximately $6,500 or only $20,000, respectively. Moreover, Michael P. Cascino indicates that the letter may have been sent to over 11,000 individuals, some of whom were clients of Cascino and some of whom were not. *See* affidavit of Michael P. Cascino, Dkt. No. 1351 (Dec. 2, 1994).

■ Another letter simply misrepresented class members' rights to receive compensation under the terms of the *Georgine* Stipulation. It stated that "Since you are asbestos exposed, but not yet diagnosed with an asbestos disease, YOU WILL GET NO MONEY IF YOU STAY IN THE CLASS." Settling parties' joint motion, exhibit 8. This statement is completely false as it relates to a large portion of class members. While it is true that class members who never manifest a disability due to asbestos exposure will not receive compensation, for individuals who will

eventually suffer from asbestos disease, they will receive money. Because it is impossible for the author to know who unfortunately will suffer from asbestos disease, it entirely misrepresents the terms of the Stipulation to say that if a class member is asbestos exposed, but has not yet been diagnosed with asbestos disease, that class member will receive no compensation.

■ Further, one letter even falsely suggested to class members that leading newspapers were against the *Georgine* settlement. The "DEAR CLIENT" letter of the Jaques Admiralty Law Firm sent to both clients and nonclients *strongly* suggested that *The New York Times, The Washington Post,* and *The Wall Street Journal* described the *Georgine* class action as a "SCAM, RIP–OFF, LEGAL SWINDLE, OUTRAGE and wholesale duping of your legal rights." *See* settling parties' joint motion, exhibit 10. The settling parties argue, and the Jaques Admiralty Firm does not dispute, that this statement is false. Copies of this letter were sent to 28,550 individuals during the two-week interval immediately preceding the opt-out deadline. *See* certification of Jaques, Dkt. No. 1292 (Nov. 7, 1994) at ¶ 3.

■ Other misleading communications ominously asserted that under the terms of the settlement, class members would "have certain obligations to the Center for Claims Resolution." *See e.g.,* settling parties' joint motion, exhibits 6, 7, 14. I find this statement, when made without further clarification, to be misleading. While it is true that class members will have to present evidence to prove that they are members of the class and that they meet certain medical criteria, *see* Stipulation, section III, the burden on class members to present evidence to recover compensation under the terms of the settlement is less than in the tort system. In fact,

---

**19.** The $6,500 figure is misleading even considering that the settlement contains no adjustment for inflation. *See Georgine,* 157 F.R.D. at 278. At the time that the letter was drafted, it was impossible to determine with any certainty what compensation procedure an individual who developed lung cancer would elect to pursue, how much she would be awarded, and the present value of that amount when it was awarded. *See* Stipulation, section VIII.B.

**20.** If a class member who develops lung cancer or mesothelioma chooses to receive compensation through the "Simplified Payment Procedures," she will receive $10,000 and $20,000, respectively. Stipulation, section VIII.B.1. If the claimant elects to receive compensation under the "Extraordinary Claim Procedure," she will receive, *at a minimum,* the same amount provided under the "Simplified Payment Procedures." *See* Stipulation, section IX.

under the terms of the settlement, class members *do not* have to prove liability, or the timeliness of their claims. *See* Stipulation, section VI (CCR tolls applicable statutes of limitation or any other applicable doctrine concerning staleness of claims, as of the date that the *Georgine* complaint was filed). In short, the suggestion to class members that the settlement will create "obligations" to the CCR represents an attempt by counsel opposed to this settlement to scare individuals into believing that considerably more will have to be done to obtain compensation under the terms of the settlement than in the tort system. Generally, this is untrue. For additional examples of misleading communications, see settling parties' joint motion, exhibit 9 (letter to six union locals in Delaware, at least one of which was not a client, explaining that class members who remained in the class were "putting their faith in the goodwill of the asbestos industry to compensate them for the asbestos related illnesses they may develop in the future." Letter fails to explain the various options available to a claimant, the oversight provisions in the Stipulation and that claims settled in this case are against

CCR defendants only and not the entire asbestos industry, and that compensation must fall between above minimum values.), exhibit 14 (newsletter of law firm of Weitz & Luxemberg sent to 9,000 clients in December 1993 inaccurately stating that there is a "cap" or maximum amount of recovery that will be paid without reference to procedures available to exceed cap); exhibits 16 and 17 (stating that "[t]his proposed settlement forces you to give up something ... FOR NOTHING IN RETURN").[21]

 Another misleading characteristic of the letters and advertisements disseminated by counsel is that each of them failed to disclose that the authors had a strong pecuniary interest in disseminating/publishing the communications.[22] *See* settling parties' joint motion, exhibits 1–17. As an initial matter, because many class members who were exposed to the letters and advertisements may not have been represented by the author of the particular communication, and because all but one of the communications solicited readers to call the author, dissemination of the letters and advertisements helped au-

---

**21.** Copies of one letter sent to 600 individuals by attorneys objecting to the settlement stated that "[t]he proposed settlement amounts are much too low and much less than historic out-of-court settlements and jury trial verdicts." Settling parties' joint motion, exhibit 13; *see* certification of Shein at (a)(i). The latter half of this statement is clearly misleading. The compensation values provided in the settlement were negotiated based on the CCR defendants' historical settlement averages and other factors including the CCR defendants' waiver of defenses, the speed in which payment will be made under the terms of the settlement, and the reduced transaction costs, including attorneys' fees. In fact, I have previously found that the compensation values provided in the settlement are "a reasonable reflection of the CCR defendants' historical settlement averages from the tort system." *Georgine,* 157 F.R.D. at 277. The statement that settlement amounts are much less than historic out-of-court settlements and jury trial verdicts fails to inform the reader that, (1) *Georgine* settlement amounts are consistent with those historically paid by the *CCR defendants;* (2) while it is possible that jury trial verdicts have been in excess of the settlement values, many plaintiffs who go to trial fail to establish an essential element of their case, *i.e.* liability, and recover nothing; and (3) that a person who remains in

the class may sue other asbestos manufacturers to claim additional funds by way of settlement or verdict.

**22.** Rule 4.3 of the Pennsylvania Rules of Professional Conduct (Rule 4.3(a) and (c) are almost identical to Rule 4.3 of the ABA Model Rules of Professional Conduct) states,

(a) In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.

(b) During the course of a lawyer's representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client.

(c) When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding.

I express no opinion at this time whether Rule 4.3 was violated. *See* Loc.R.Civ.P. 14 ("The Rules of Professional Conduct adopted by this Court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania.").

thors obtain additional clients.[23] In addition, asbestos plaintiffs' counsel would benefit financially from additional opt-outs in the following ways: (1) As previously noted in this Court's August 16, 1994 memorandum opinion, attorneys who file claims under the *Georgine* Stipulation will receive a maximum 20–25% contingency fee as opposed to a 33–40% contingency fee in general asbestos litigation, see *Georgine*, 157 F.R.D. at 277 n. 23;[24] (2) Under the terms of the *Georgine* Stipulation, attorneys who represent clients who have non-disabling pleural-only conditions will not obtain fees (or benefits for their clients) until the clients exhibit a disability caused by asbestos whereas individuals who opt out may receive settlements merely by bringing suit even though they are unimpaired, thus attorneys' fees are earned promptly; (3) Attorneys who have large inventories of asbestos-related cases would be forced to obtain settlement amounts within the confines of the *Georgine* Stipulation as opposed to the unrestrained and boundless possibilities created by open negotiation; and

(4) In general, additional opt-outs would give plaintiffs' attorneys greater opportunity to obtain the occasional massive fee from an exorbitant award by a sympathetic jury; and (5) An excessive number of opt-outs could cause the CCR to withdraw from the settlement at the outset pursuant to section XXI of the Stipulation or could have caused this Court to declare the settlement to be unfair based upon the reaction of the class.[25] *See In re School Asbestos Litig.*, 842 F.2d at 681–83 (booklet distributed by association of corporate defendants was misleading because of purported objectivity and neutrality and its failure to indicate the authors' involvement in the litigation).[26]

While this Court encourages the free flow of ideas relating to the advantages and disadvantages of the settlement, in order to evaluate the relative merits of conflicting arguments, identification of their source may be required. *See First National Bank of Boston v. Bellotti*, 435 U.S. 765, 791, 792 n. 32, 98 S.Ct. 1407, 1423–24, 1424 n. 32, 55 L.Ed.2d

**23.** Indeed, many of the communications here may well have been furnished to class members with whom the authors did not have a formal attorney-client relationship. *See* certifications relating to exhibits 3–6, 9–13, 15–17 to settling parties' joint motion.

**24.** This factor is significant when multiplied by the large inventories of cases handled by many of the asbestos plaintiffs' attorneys who disseminated/published the communications at issue.

**25.** It is disingenuous for counsel representing Objectors to imply that their interests are always aligned with those of all class members. Attorneys representing clients who object to the settlement because both attorney and client believe that they could obtain greater compensation in the tort system would have interests that are adverse from those of a class member who would have difficulty proving liability and whose best avenue for compensation would be the *Georgine* settlement.

**26.** In addition to sending misleading communications, counsel who communicated with class members who were not their clients after the class was conditionally certified may have violated their ethical duty to refrain from communicating about the substance of the settlement with class members represented by another lawyer. *See* Model Rules of Professional Conduct Rule 4.2 (1983) (formerly ABA Code of Professional Responsibility Disciplinary Rule 7–104); Pennsylvania Rule of Professional Conduct Rule 4.2.

First, at least one law firm sent letters regarding the settlement to class members who were represented by personal counsel. *See* settling parties' reply, exhibit 21. Second, many attorneys who served to profit from additional opt-outs sent letters to individuals to advise them to opt out of the class despite the fact that they were represented by class counsel. *See Kleiner*, 751 F.2d at 1207 n. 28 ("At a minimum, class counsel represents all class members as soon as a class is certified, ... if not sooner.") (citations omitted); Order, Dkt. No. 703 (Jan. 31, 1994) at 2 n. 1; *Haffer v. Temple Univ. of Commw. System of Higher Education*, 115 F.R.D. 506 (E.D.Pa. 1987); *Tedesco v. Mishkin*, 629 F.Supp. 1474, 1482–83 (S.D.N.Y.1986); *Impervious Paint Ind.*, 508 F.Supp. at 723; *see also Gulf Oil Co.*, 452 U.S. at 104 n. 21, 101 S.Ct. at 2202 n. 21 ("the rules of ethics properly impose restraints on some forms of expression. *See, e.g.*, ABA Code of Professional Responsibility, DR 7–104 (1980)").

In addition, these attorneys may have violated Rules 8.4(c) and (d) of the ABA Model Rules of Professional Conduct, adopted in Pennsylvania, by engaging in conduct that involves misrepresentation and is prejudicial to the administration of justice. Because this is not a disciplinary proceeding, it is not necessary to determine if any of the ethical rules have been violated at this stage, however, the presence of these serious issues demonstrates the necessity for close monitoring of any allegedly improper interdiction of the fair notice procedures approved by this Court.

707 (1978). In the instant case, because none of the communications at issue revealed to the recipient that the drafter had a financial motive to obtain additional opt-outs, the recipient was not on notice to closely scrutinize the substance of the communications. Moreover, as apparent disinterested officers of the court, class members likely believed the communications. To make the problem worse, many of the letters and advertisements did not inform the reader that the author or his firm already had voiced objections to some aspects of the *Georgine* class action. *See* settling parties' joint motion, exhibits 1–4, 9, 10, 13. Finally, two of the letters did not even indicate that the drafter had other clients who were similarly situated or that the author was providing the same advice to all of them.[27] *See* settling parties' joint motion, exhibits 7, 12.

■ To compound the problem, but not the sole factor that makes these communications misleading, is the fact that almost all of the communications submitted by the settling parties in support of their joint motion contain one-sided attacks on the proposed settlement without any mention of its benefits. *See e.g.*, settling parties' joint motion, exhibits 1–10, 12–17.[28] Indeed, most do not even note the existence of a Court-approved notice packet or how to obtain one. *See e.g.*, settling parties' joint motion, exhibits 1, 4, 5, 7, 8, 9–13, 15–17. It is apparent that the man-

ner in which information was presented in these letters and advertisements was certain to discourage class members from participating in the settlement. The one-sided attacks, and the failure to discuss the notice materials or the drafters' interests, are not factors that when taken alone or even together contaminate the notice process.[29] Rather, when considered in conjunction with the misleading statements and omissions of counsel, they lead to the inescapable conclusion that class members who were exposed to these communications could not make an informed choice of whether to remain in the class or to opt out. *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977). The content of these letters and advertisements were deceptive and because the drafters appeared to be disinterested officers of the court, class members likely believed and acted upon them. Moreover, because the misleading statements often were sandwiched between fervent pleas to opt out, the likelihood that class members would comply with the demands was increased.[30] Finally, the failure of the letters and advertisements to discuss the notice materials, or of the authors to assist in the dissemination of the notice packets further increased the likelihood that class members did not consider the accurate Court-approved information that this Court deemed to be necessary to enable class members to make an informed choice of whether or not to opt out of the class.[31]

27. This fact is important because the recipient should know that the author would not benefit solely from the client's individual circumstances. For example, it would be reasonable for a client to know that her attorney sought to benefit from additional opt-outs as the difference in the contingent fee under the *Georgine* Stipulation would become more significant with the addition of more clients who opted out of the class.

28. *See e.g.*, settling parties' joint motion, exhibit 6 (letter sent to ten labor unions only stating deficiencies of the settlement and requesting that "members" do not communicate with class counsel or return any forms to them), exhibit 15 (notice, appearing in eight publications, only expressing negative aspects of settlement); exhibits 16, 17.

29. Indeed, if one-sidedness were the only issue here, the communications at issue would not be actionable. Many negative aspects of the settlement described in the letters and advertisements were not included in the notice materials and

class members rightfully can be informed of them.

30. Because many of the communications were so outrageously sensational and negative, they likely would scare an individual into opting out of the class even if she received the Court-approved notice materials.

31. This finding is not intended to suggest in any way that the Rule 23 notice is intended to place a cap on the amount of information that class members may receive. Nor does the Court believe that all communications disseminated by lawyers opposing the settlement must be subject to the same neutrality requirements that apply to court-approved Rule 23 notices. *See* opposition memorandum of Adrian Elfenbaum to settling parties' motion for an order establishing a second notice and opt-out period for class members who have requested exclusion from the class ("Elfenbaum opp.") at 17. In addition, this Court has not changed its opinion that the plain-

I find that the misleading aspects of the communications of counsel were self-evident. These communications undermined the spirit of the notice plan approved by this Court. Back on January 29, 1993, Judge Weiner conditionally certified the class so that notice could be disseminated to class members and the class could be made aware of their various options regarding this action. The misleading, coercive and overzealous communications with the class have frustrated this Court's purposes and likely have created fear and confusion among class members. "This, of course, increases the possibility that class members will opt out, thereby defeating the policies behind Rule 23 class actions." *Tedesco,* 629 F.Supp. at 1483.[32]

This Court has exercised considerable time and resources to review and monitor the procedures undertaken by the settling parties to notify class members regarding the aspects of this settlement. On October 27, 1993, I determined that the notification materials " 'contain[ed] information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class', and thus [met] the requirements of Rule 23(c)(2) and (e)." *Carlough,* 158 F.R.D. at 332 (quoting in part *In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d at 1105).[33] I approved the notice plan because it apprised prospective class members of the terms of the proposed settlement in a neutral fashion that would enable class members to make an informed choice. *Id.; see In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 223 (5th Cir.1981). I now conclude that the misleading letters and advertisements of counsel opposed to the settlement interfered with the careful balance that the notice package achieved. Instead of providing class members with documents that would enable a reasonable person to make an informed, intelligent decision whether to opt out or remain a member of the class, some counsel have now exposed class members to one-sided, misleading claims that likely will prohibit a "free and unfettered" decision to opt out of the class. *See Erhardt,* 629 F.2d at 846 ("Unapproved notices to class members which are factually or legally incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice.").[34] Included in my responsibility to direct to the class the best notice practicable is the duty to ensure that the class receives accurate information. *Erhardt,* 629 F.2d at 846. Under Fed.R.Civ.P. 23(d), it is my duty to protect the integrity of *the class* and the administration of the class generally. *See In re School Asbestos Litig.,* 842 F.2d at 681–83. I conclude that the communications of the type examined by this Court today have threatened the integrity of the entire *Georgine* litigation. Accordingly, the following

---

tiffs' attorneys were not compelled to take part in the dissemination of the Court-approved notice packet. *See Carlough,* 158 F.R.D. at 329 & n. 16.

**32.** The exhibits to the Elfenbaum opposition do not dictate a different conclusion. First, Elfenbaum has not demonstrated any factual inaccuracies in those documents. Moreover, as to exhibits C and D, they are press stories and, therefore, their tone and approaches were not necessarily within the power of those quoted. Finally, Elfenbaum's argument that the 1990 law review article attached to the opposition at exhibit E somehow hides various facts about the CCR misses the mark. The article titled, "The Center for Claims Resolution" clearly states that the organization consists of twenty-one producers of asbestos or asbestos containing products. *See* Elfenbaum opp., exhibit E at 1, 3.

**33.** Rule 23(c)(2) requires that the notice shall "advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel." Fed.R.Civ.P. 23(c)(2).

Moreover, Rule 23(e) provides that "notice of the proposed ... compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 23(e).

**34.** The August 16, 1994 memorandum opinion of this Court, and more specifically, Finding of Fact 300 and Conclusions of Law 92, 93, and 101, only approved the notice procedures and content as set forth in the notice materials and dissemination plan submitted to the Court. This Court and all parties were aware of the instant undecided joint motion at the time the August 16, 1994 memorandum opinion was filed and I did not intend thereby to express any conclusion regarding the effect of the misleading letters and communications on the class at issue here.

discussion addresses the appropriate remedy to cure the damage that likely has occurred.

## 2. Remedy

 The initial consideration in determining the appropriate remedy is the degree of harm caused by the improper conduct. *Kleiner v. First National Bank of Atlanta*, 102 F.R.D. 754, 772 (N.D.Ga.1983), *aff'd in part, vacated in part, and rev'd in part*, 751 F.2d 1193 (11th Cir.1985). The issuance of a remedial order under Fed.R.Civ.P. 23(d) does not require a finding of actual harm. *In re School Asbestos Litig.*, 842 F.2d at 683. A remedy is appropriate if the communications at issue create a "likelihood" of abuse, confusion, or an adverse effect on the administration of justice. *Id.* ("Rule 23(d) does not ... require a finding of *actual* harm; it authorizes the imposition of a restricting order to guard against the '*likelihood* of serious abuses.'"). In fact, courts have recognized that the extent of harm resulting from a campaign to solicit opt-outs "cannot be quantified with any precision," and hence "the Court must make its best estimate, taking into account the likely effect of the solicitation program based on its nature." *Kleiner*, 102 F.R.D. at 772; *see Impervious Paint Ind.*, 508 F.Supp. at 723–24 (remedy is necessary if it "appear[s]" that improper communications have been effective and thus cannot determine if class members made an honest decision.); *Sommers v. Abraham Lincoln Federal Savings & Loan Ass'n*, 79 F.R.D. 571, 577 n. 4 (E.D.Pa.1978) (remedy appropriate where undue influence "may or may not have caused inordinate amount of 'opt-outs'").

 I find that the communications by counsel opposed to this settlement likely confused and misled class members, caused a high number of opt-outs and, therefore, had an adverse effect on the administration of justice. As discussed above, the numerous inaccurate statements and misleading omissions related to key points of the settlement agreement and, therefore, likely affected class members' decisions to opt out of the class. These inaccuracies concerned the right to compensation under the settlement formula generally, the amount of compensation to be collected under that plan, the rights of the CCR defendants, and the obligations of class members prior to receipt of funds, etc. In fact, because most of the communications did not advise class members of the existence of the Court-approved notice package, class members were asked to opt out without the neutral and accurate presentation of the issues as required by Rule 23 of the Federal Rules of Civil Procedure.[35] In addition, because these letters and advertisements were written and disseminated by lawyers, and because many of them held themselves out as disinterested observers, these communications are likely to have influenced class members to opt out of the *Georgine* class.

The likelihood of harm also is increased by the extent of the opt-out campaign. The record demonstrates that the communications at issue were widely distributed to many thousands of class members and were just a part of a "massive campaign" to solicit opt outs all over the United States. Specifically, from this record I find that a total of 62,550 misleading letters regarding the *Georgine* settlement, copies of which were attached to the settling parties' joint motion, were disseminated to individuals many of whom were members of the class.[36] *See*

35. Moreover, some letters and advertisements instructed class members not to consult with class counsel. *See* discussion *supra* note 28.

36. This figure does not include the 28,681 people who were sent copies of exhibits 1, 3, 4, 11 and 12 to the settling parties' joint motion. Although these letters likely deceived class members regarding the *Georgine* settlement because (1) they were one-sided; (2) they did not disclose the authors' interests in obtaining additional opt-outs; and (3) four letters did not reveal that the authors or their clients officially were objecting to the settlement, because this memorandum does not refer to a *specific* statement or omission in those letters that was misleading, in the interests of obtaining a conservative estimate of the likely exposure to the class, I will not consider the degree of dispersement of these letters as determinative here. I will note, however, that because of the likely exposure of the class to the other misleading communications, I believe these five letters may have further increased the likelihood of reliance on the other misleading communications. *See* certifications of Peter G. Angelos, Dkt. No. 1288 (Nov. 7, 1994), Rosenberg and Brookman, Dkt. No. 1299 (Nov. 7, 1994), Kazan,

settling parties' joint motion, exhibits 2, 5–10, 13, 14; certifications of Baron & Budd, Dkt. No. 1289 (Nov. 7, 1994), Ferraro & Associates, P.A., Dkt. No. 1279 (Nov. 1, 1994), Jaques, Dkt. No. 1292 (Nov. 7, 1994), Shein, Dkt. No. 1285 (Nov. 4, 1994), Weitz & Luxemberg, Dkt. No. 1343 (Nov. 28, 1994), affidavit of Cascino, Dkt. No. 1351 (Dec. 2, 1994).[37] Moreover, misleading letters also were sent to 16 labor unions, the sizes of which were not disclosed to the Court. *See* settling parties' joint motion, exhibits 6, 9; certification of Colleran, O'Hara & Mills, Dkt. No. 1371 (Jan. 23, 1995); letters of Robert Jacobs, Dkt. Nos. 1334, 1302 (Nov. 22, 1994, Nov. 8, 1994). Finally and most dramatically, the likely exposure of class members to the misleading *advertisements* attached to the settling parties' joint motion is enormous. The misleading advertisements attached as exhibits 16 and 17 to the settling parties' joint motion were printed in at least three newspapers that had a minimum total circulation of approximately 605,000.[38] *See* settling parties' joint motion, exhibits 16, 17;

certifications of Rosenberg and Brookman, Dkt. No. 1299 (Nov. 7, 1994), Shein, Dkt. No. 1285 (Nov. 4, 1994), letter of Shelby and Crawford, Dkt. No. 1370 (Jan. 18, 1995). The timing of the dissemination and publication of these letters and advertisements is especially revealing, as *each and every* letter or advertisement was disseminated and/or published during the three month opt-out period. In sum, I find that the total amount of individuals who likely were exposed to the misleading communications attached to the joint motion of the settling parties during the opt-out period was *at least* 667,550.[39]

The strong impact of the communications is also doubtless because at least two of the letters were sent to labor unions and, therefore, many more individuals may have been contacted by union members. Moreover, at least one letter urged recipients to advise other class members to opt out. *See* settling parties' joint motion, exhibit 5. The national scope of this litigation, and specifically, the

McClain, Edises & Simon, Dkt. No. 1294 (Nov. 7, 1994), Pyle and Higbee, Dkt. No. 1290 (Nov. 7, 1994).

**37.** No individual filed a document that established that the use by this Court of any of the letters attached to the settling parties' joint motion was prohibited by the attorney-client privilege. *See Barr Marine Products Co. v. Borg–Warner Corp.*, 84 F.R.D. 631, 633 (E.D.Pa.1979) (most frequently cited elements of attorney-client privilege); *Rhone–Pulenc Rorer Inc. v. Home Indemnity Co.*, 1991 WL 231781, at *1 (E.D.Pa. Oct. 31, 1991) (A party claiming attorney-client privilege has the burden of establishing that the material sought to be protected falls within the doctrine.); Order, Dkt. No. 1321 (Nov. 14, 1994) (inviting certain individuals to file a sworn affidavit establishing that each element of the attorney-client privilege has been met); opposition of Maritime Asbestos Claimants at 3.

**38.** Similar to the discussion in note 36, because this memorandum does not discuss a specific statement or omission in the "notice" attached as exhibit 15 to the settling parties' joint motion, I will not consider the total circulation of 168,200 of the eight "newspapers" in which the notice was published as determinative. I will note, however, that for the same reasons discussed in note 36, exhibit 15 likely contributed to misleading class members as well. *See* certification of Dies and Carona, Jr., Dkt. Nos. 1286, 1303, (Nov. 4, 1994, Nov. 8, 1994).

**39.** The same conclusion would be reached whether or not the certifications requested in this

Court's October 14, 1994 and November 14, 1994 Orders were filed. Even without an examination of the documents submitted by the authors of the misleading letters and advertisements, the likelihood of harm to the class was apparent due to the (1) nature of some correspondence as "Dear Friend" or "Dear Member" letters which typically are sent to large numbers of people; (2) fact that the advertisements were placed in newspapers which likewise were likely to be circulated to many thousands of class members; and (3) comments of Mr. Baron regarding the extent of the campaign to solicit opt-outs. These certifications did, however, confirm the Court's preliminary conclusions.

Moreover, in evaluating the communications of the parties, this Court considered the effect of the letters and advertisements attached as exhibits 1–17 and those attached to the brief of Adrian Elfenbaum in opposition to the settling parties' motion. This Court *only* additionally considered the documents that were attached to the certification of Shein and the letter of Shelby and Crawford. While this Court has the power to obtain other information relating to the dissemination of potentially misleading materials, because the materials already submitted create such a strong likelihood that thousands of class members all over the United States were exposed to the letters and advertisements attached to the settling parties' joint motion, it is not necessary at this time for this Court to obtain any further information.

national character of the client-base of counsel of record, suggest that individuals throughout the United States probably were exposed to these misleading communications. The geographic limits of class members' exposure to the misleading communications is not apparent because the submissions of the parties do not indicate the residence of individuals to whom the misleading communications were sent. In any case, this information would not rule out the possibility that the misleading letters or advertisements were not redistributed by class members or others. Finally, as it is common knowledge that the newspapers in which the advertisements at issue appeared are sold at newsstands all over this country, I conclude that it is likely that class members all over the United States were exposed to the misleading communications of counsel here.

The breadth of the effort to solicit opt-outs using misleading letters and advertisements was confirmed by Mr. Baron, one of the lead attorneys objecting to the settlement. At a hearing held on January 12, 1994 relating to the emergency motion of the CCR defendants regarding misleading communications with potential class members, Dkt. No. 610 (Jan. 12, 1994), Mr. Baron stated that,

> In terms of the campaign [to solicit opt outs] ..., as the Court I'm certain has to be aware, it's a massive campaign that's being sponsored by unions, public relations people, I saw Mr. Shein's (ph.) advertisement in the Philadelphia newspaper, there was an advertisement in a Delaware newspaper the other day that I saw that seemed to use the same ad, other lawyers have concocted ads.[40] These types of things are going on all over the United States right now.

Jan. 12, 1994 Hearing Transcript at pp. 39–40. I accept as candid and reliable the statement from lead counsel for the Objectors in this nationwide litigation. The substance of this candid report suggests that this Court probably does not know of other overly aggressive or inaccurate communications from counsel which influenced class members to opt out.

The organized opt-out campaign apparently commenced before the complaint was even filed on January 15, 1993. On October 26, 1992, a letter was sent to asbestos plaintiffs' lawyers by the co-chairs of the Independent Asbestos Litigation Counsel, a group of asbestos plaintiffs' lawyers. See settling parties' joint motion, exhibit 18. That letter stated that the CCR had to be "informed, loudly and clearly, of the widespread opposition to any nationwide class action to dispose of future claims," and that,

> [o]ther efforts must commence immediately. According to the information we have received the national future class will be an opt-out class. Each of us who opposes it must, therefore, begin immediately to assemble lists of all potential trade union members and other persons who have been or may be exposed to asbestos, in order to opt them all out. We should be prepared to file millions of opt-outs the day the class action is filed. It is quite likely that the class action agreement provides some trigger point at which it self destructs if a certain number of opt outs are reached. We must be organized and ready to try to trigger that opt out critical mass.[41]

Settling parties' joint motion, exhibit 18.

The communications of counsel opposed to the settlement apparently were quite effective. According to the settling parties' supplement to the final notice report filed August 4, 1994, approximately 201,654 exclusion requests had been received by the January 24 1994 postmark deadline by or on behalf of

---

**40.** An advertisement disseminated by Mr. Shein's law firm is attached to the settling parties' joint motion at exhibit 16. I have previously found at least one statement in that advertisement to be misleading. See discussion *supra* part II.B.1(a).

**41.** It is disturbing that the letter does not discuss *any* of the specific attributes or deficiencies of the *Georgine* settlement. Rather, it vows to oppose any attempt to prohibit claimants, in a nationwide class action, from filing cases in the future and prosecuting their cases to jury trial if they so desire. Although there has been no specific connection between this organization and the misleading communications, again, this letter merely suggests that the existence of other misleading communications is likely. In any case, the quotation above was inserted merely to provide some perspective and does not form the basis of the decision here.

exposed individuals, and approximately 34,-669 additional forms had been filed by affiliated family members.[42] Moreover, approximately 13,773 opt-out forms (11,955 on behalf of exposed individuals and 1,818 by affiliated family members) had been received with postmarks after January 24, 1994. An additional 14,219 opt-outs were received on behalf of exposed individuals and 660 by affiliated family members, but were signed by attorneys.[43] *Georgine,* 157 F.R.D. at 312, *see* supplement to final notice report, Dkt. No. 1128 (Aug. 4, 1994) at 2–4.

In addition to the large number of opt-outs, the certification filed by Michael F. Rooney on behalf of the CCR defendants on November 8, 1994 indicates that more than 95% of the requests for exclusion were submitted on forms or postcards other than those included in the Court-approved notice packets. *See* certification of Michael F. Rooney, Dkt. No. 1304 (Nov. 8, 1994) at ¶ 7. Moreover, the CCR was able to associate 28,324 exclusion requests with the specific plaintiffs' counsel or firms who authored the 11 exhibits to the settling parties' joint motion to which this Court addressed a specific misleading statement or omission.[44] *See* certification of Rooney (total of 43,508 exclusion requests associated with counsel who authored 17 exhibits to the settling parties'

joint motion). Only 212 of those exclusion requests were filed on the original Court-approved opt-out forms. In sum, because of the content, timing and breadth of the campaign to solicit opt-outs by use of misleading communications, I find that the misleading communications of counsel at issue here likely caused tens of thousands of class members to opt out of the *Georgine* class.

Furthermore, because it is impossible to determine which class members who filed exclusion forms were exposed to the misleading and improper communications "without hearing testimony from each and every person contacted," I must make my own best estimate of the people affected by taking into account the likely effect of the solicitation program based on its nature. *Kleiner,* 102 F.R.D. at 772. I find that because the communications were so misleading and threatening, and because the letters and advertisements were disseminated mostly by individuals who were counsel of record in this case and who attached exclusion request forms to the messages,[45] and because almost all of the exclusion requests received were submitted on forms that were not included in the Court-approved notice packet, and because the campaign to solicit opt-outs by use of misleading letters and advertisements was so

---

**42.** The final notice report of the settling parties stated that over 6.8 million individuals received individually delivered notice materials and millions more were notified through media efforts. *See* settling parties' final report on implementation of notice, Dkt. No. 777, (Feb. 16, 1994); *Georgine,* 157 F.R.D. at 312.

As for the size of the class, I have previously found,

> Although the exact size of the class is unknown, it is undisputed that there are many tens of thousands of class members.... [T]he Objectors have, at various times, estimated the size of the class at issue here as ranging from 20 to 30 million. May 28, 1993 Hearing, Transcript at p. 51, 58; Wiese parties' mem. of law in opposition to the settling parties' joint motion for approval of the notice to the class at 1 (Sept. 16, 1993); Dec. 17, 1993 Hearing, Transcript at 153.

*Georgine,* 157 F.R.D. at 261, 325.

**43.** I have concluded on two prior occasions that it is improper for counsel to file an opt-out form on behalf of their present or future clients. *See* Orders dated January 11, 1994, Dkt. No. 618, and January 13, 1994, Dkt. No. 626 (denying

requests to permit attorneys' signatures on exclusion request forms).

**44.** The CCR's data entry staff attempted to associate exclusion request forms with specific plaintiffs' counsel or firm in the following ways: (1) the return address on the envelope containing the exclusion request listed the attorney's or the firm's name and address; (2) the exclusion request was accompanied by a cover letter from an attorney or firm; (3) the exclusion request was on a form that an attorney or firm had drawn up and contained the attorney's or firm's name; or (4) the attorney's or firm's name was written at some place on the exclusion request or transmittal envelope. Certification of Rooney at ¶ 3. Many exclusion requests that were filed by or through attorneys or firms contained no indication of this fact on the exclusion form or envelope, and hence could not be associated with an attorney or firm. *Id.*

**45.** Many of the attorneys who disseminated the misleading communications briefed the matter of notice, participated in a hearing on the matter and even submitted proposed findings and conclusions of law.

extensive, it is likely that the misleading communications had a very substantial impact on the number of opt-outs. As a result, I conclude that it is likely that members of the class were misled and, therefore, unduly influenced to opt out of the class. *Impervious Paint Ind.*, 508 F.Supp. at 723 ("It is essential that the class members' decision to participate *or to withdraw* be made on the basis of independent analysis of [their] own self-interest.") (emphasis added).

### (a) Creation of second notice and opt-out period

#### 1. Rule 23

█ As noted earlier, the notice required by Rule 23 mandates that class members be exposed to information that will enable them to make an informed, intelligent decision whether to opt out or remain a member of the class. *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d at 1105. Pursuant to Fed.R.Civ.P. 23(d)(2), this Court may issue appropriate orders "requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as [I] may direct to some or all of the members of any step in the action." Fed.R.Civ.P. 23(d)(2). Accordingly, because I have concluded that class members who were exposed to the misleading communications likely did not make a free and unfettered decision to opt out of the class, pursuant to my inherent authority to control the litigation and the attorneys before the court,[46] and my duty to manage the notice to the class under Rule 23, I will restore to the members who originally filed timely exclusion requests the opportunity to make a new independent decision to opt out of the class. Fed.R.Civ.P. 23(c)(2), 23(d), 23(e). *See Kleiner*, 751 F.2d at 1201; *Impervious Paint Ind.*, 508 F.Supp. at 721–22 ("[I]f these class members did, in fact, make a free and unfet-

tered decision in choosing to withdraw, then they will do so again."); *Kleiner*, 102 F.R.D. at 772 ("The Court's first task in fashioning the appropriate remedy is to attempt to restore the *status quo* if possible."); *see also In re Mitchell*, 901 F.2d 1179, 1188 (3d Cir. 1990); *Commonwealth Insurance Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1203 (E.D.Pa.1992) ("One of the inherent powers of any federal court is the admission and supervision of the conduct of attorneys practicing before it.").

█ It is basic that a remedy should be restricted to the minimum necessary to correct the effects of improper conduct under Rule 23. *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir.), *cert. denied, Blue Cross of Western Pa. v. Marsh*, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977). As a result, I will not require a new massive national notice campaign to the entire class but rather will void only those exclusion requests filed before January 24, 1994 and require that only those who originally opted out of the class be given the opportunity to reaffirm their decision. A curative notice shall be sent to those individuals who originally filed exclusion request forms which shall contain a brief statement setting forth the reasons for the new opt-out period. An updated version of the Court-approved notice materials shall be included as well. Moreover, the new notice and opt-out period shall extend to end on a date certain approximately four weeks after its commencement. This period is shorter than the previous opt-out period as the relevant class members are already familiar with the *Georgine* class action and the new notice materials can be sent directly to them. There is no need to allot time for class members to become aware of the new opt-out period through the mass media.

---

**46.** Because this is a national class action whose absent class members are parties to the litigation, and although their attorneys or would-be attorneys may not have entered an appearance in this action, these attorneys and their communications are subject to the oversight of this Court. *See* certifications related to exhibits 1–5, 7, 9–17 to settling parties' joint motion (indicating that attorney represented client who is likely a member of class); *see also In re Domestic Air Trans.*

*Antitrust Litig.*, 24 Fed.Rules Serv.3d 515, 516 (N.D.Ga.1992) ("The certifying court, therefore, has inherent jurisdiction to supervise any person or entity seeking to act on behalf of the prospective members of the class, including a party attempting to give notice of a class member's rights."); *Jack Faucett Assoc. v. American Telephone and Telegraph Co.*, 1985 WL 25746, at *6 (D.D.C. Oct. 18, 1985).

It is not necessary to permit class members who did not originally opt out of the class to now receive a second opportunity to do so. I have previously found that the deceptive communications likely influenced class members *to opt out* of the class, hence, those who originally decided *not* to opt out of the class cannot claim that exposure to the improper communications caused them to *remain* in the class. *See* Elfenbaum opp. at 28.

The Objectors argue that exclusion requests filed by various groups of class members should not be invalidated. First, the Wiese objectors assert that the exclusion requests filed on Court-approved opt-out forms should not be voided because "[t]hese persons obviously had the benefit of the 'neutral' description of the class action and settlement and nonetheless chose to opt out." Wiese opp. at 21. I reject this argument. As discussed *supra*, the misleading letters and advertisements broadly subverted the notice process. The communications of objecting counsel interfered with the neutral balance achieved by the Court-approved materials. Many of the misleading communications were so extreme that they very likely have caused class members to opt out despite receipt of the Court-approved notice packet. Simply, the notice packet was designed to inform class members about the various aspects of the settlement, not to combat the affect of the misleading communications. Accordingly, because it is not possible to determine whether those who filed Court-approved exclusion request forms received and were influenced by the misleading communications,

out of the exercise of reasonable caution, these class members must be given another opportunity to opt out of the class.[47]

Objectors also argue that those individuals who opted out of the class on the advice of their counsel should not be afforded a chance to affirm their earlier decision. The Objectors assert that the opt-outs of class members who acted on the advice of counsel cannot be invalidated because the court will be dictating the substance and content of communications between lawyer and client. This argument is both impracticable and unsubstantiated. At the outset, it is impossible to determine the actual basis for a class member's decision to opt out. This Court would be forced to conduct mini-trials to determine whether each individual acted on the basis of her attorney's comments, the misleading communications, or both. As noted earlier, the misleading communications of counsel were pervasive and national in scope so it would be impossible to determine exactly which class members were exposed to them. *See Impervious Paint Ind.,* 508 F.Supp. at 724 (where communications campaign was much more limited in scope, restoring to class only those class members who had been contacted by defendant was possible). Second, the Objectors have not presented any authority to support the proposition that, in a class action, a court is not permitted to offer a class member an opportunity to reaffirm her decision to opt out if that decision was likely due to misleading communications by independent counsel or the class member's own attorney.[48]

---

47. Similarly, the argument of the Akins Objectors that class members whose counsel did not send out misleading letters should not be reinstated in the class is completely barren. *See* opposition memorandum of Akins objectors to the settling parties' joint motion at 1–2. Even if a class member's lawyer did not distribute misleading letters or advertisements, that claimant still could have received and been influenced by misleading information from other counsel. This remedy is not intended to punish counsel who misled class members, rather, its purpose is to correct the effect of the improper communications.

48. The Wiese objectors cite *McCuin v. Texas Power & Light Co.,* 714 F.2d 1255, 1263 (5th Cir.1983) to support their claim that class mem-

ber's have an apparent unfettered right to unscreened opinions and advice from counsel. However, this case supports precisely the opposite conclusion. *McCuin* involved a challenge to a court's order disqualifying an attorney who had been associated with the litigation solely to force a judge's recusal. After noting that a party generally has a right to counsel of its choice, the court stated that this "right should be balanced in cases in which it is challenged against the right to 'untainted prosecution of the lawsuit' and society's need to maintain the highest ethical standards of professional responsibility." 714 F.2d at 1263. The court in *McCuin* found that due to the various ethical rules that would be violated, a party is not entitled to counsel of its choice when the primary purpose for hiring the lawyer is forcing the presiding judge's recusal. *Id.* Similarly, in the instant case, due to the

The request by some Objectors to permit class members who excluded themselves from the class to opt back into the class rather than invalidate all opt-out notices misses the point. *See Kleiner,* 751 F.2d at 1199. I have found that thousands of class members who excluded themselves from the class likely acted upon misleading information. Accordingly, in order to place them in the position they would have been but for their exposure to the misleading letters and advertisements, it is necessary to restore them to the class. Moreover, requiring class members to affirmatively "opt into" the class would legitimize the original exclusion requests, which likely were obtained improperly.

As addressed previously, "[m]isleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally" and "Rule 23 specifically empowers district courts to issue orders to prevent abuse of the class action process." *In re School Asbestos Litig.,* 842 F.2d at 680; *see Gulf Oil Co.,* 452 U.S. at 100 n. 12, 101 S.Ct. at 2200 n. 12. This Court's findings herein justify the negation of the exclusion requests and the creation of a second opt-out period only for that group of class members who originally filed timely exclusion requests. *In re School Asbestos Litig.,* 842 F.2d at 683.

In their supplemental memorandum, the settling parties also request that, during the second notice and opt-out period, all communications by asbestos plaintiffs' attorneys that concern the class action or settlement and that are specifically directed at class members who filed timely exclusion requests bear a disclosure statement. This "disclosure statement" would inform class members that (1) there had been a prior history of misleading or inaccurate communications in this class action; (2) the Court has ordered that these class members receive a new neutral, Court-approved notice packet that

should be read carefully; (3) this Court ruled on August 16, 1994 that the settlement is fair to the class. *See* settling parties' supp. memo. at 2–3.

The validity of a disclosure requirement under Rule 23 was recognized in *In re School Asbestos Litig.,* 842 F.2d at 683, however, such a requirement is not necessary here. The general ideas expressed in the requested disclosure statement will be covered in the cover letter attached to the new notice sent to every class member who originally filed timely exclusion request forms. This will ensure that every class member who opted out is aware of the existence of the misleading communications and that all communications regarding the *Georgine* settlement should be closely examined. To require the communications of plaintiffs' attorneys regarding this settlement to bear a disclosure statement is unnecessary because the message will be received by all interested class members. Moreover, because the opt-out period is not exceedingly long in duration, there is little risk that recipients of the new notice will forget what they have read. At this stage, the requirement of a disclosure statement is excessive and unnecessarily burdensome.

Finally, my decision to create a second opt-out period is supported by the text of Fed. R.Civ.P. 23. Pursuant to Rule 23(c), class members become part of the final class unless, after receiving the "best notice practicable," they request to be excluded. "[T]he judgment, whether favorable or not, will include all members who do not request exclusion." Fed.R.Civ.P. 23(c)(2)(B). The drafters of Rule 23 "consciously designed [the rule] to tilt the balance of inertia in favor of class participation." *Kleiner,* 751 F.2d at 1201 n. 18. Accordingly, as dictated by Rule 23, once I have determined that class members have received "the best notice practicable," each class member will receive the benefits of class participation unless she excludes

misleading communications between counsel and class members, communications between attorney and client may be affected in order to ensure that the class receives accurate and reliable information. *See* Rule 8.4(c) of the Model Rules of Professional Conduct. *See also Texas*

*Catastrophe Property Insur. Ass'n v. Morales,* 975 F.2d 1178, 1181 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1815, 123 L.Ed.2d 446 (1993) (concerns right to choose one's counsel, not authority of court to affect the substance of communications between attorney and client).

herself under 23(c)(2). Because a curative notice now is necessary to enable the class to receive "the best notice practicable," class members must be restored to the class and given the opportunity to opt out once again.

The decision here to invalidate the exclusion requests because of improper communication with class members is not unprecedented. In *Impervious Paint Ind.*, the district court was presented with a situation where representatives of the defendant in a civil anti-trust action had begun to contact class members for the purpose of discussing the class members' participation in the class action. 508 F.Supp. at 722. The contacted class members were customers of the defendant. The defendant's representatives provided class members with an explanation of the class notice, reminders of the need to affirmatively opt out if the class member wished to avoid being included in the class, and advice that a class member who failed to opt out might be subject to discovery and other legal procedures. *Impervious Paint Ind.*, 508 F.Supp. at 722. The court found that the defendant's contacts were improper because the court had specifically rejected the idea of including the warning regarding discovery in the notice to the class, and the communications violated the ABA's Code of Professional Responsibility, section DR 7–104 ("DR 7–104").[49] In short, the court determined that the communications campaign orchestrated by the corporate officers of the defendant represented an attempt to sabotage the class notice. The corporation's contacts with class members were quite effective since an extraordinary percentage of the opt-outs were customers of the defendant. The court concluded that class members who opted out of the class action did not necessarily make a "free and unfettered decision" and, therefore, the class members who were contacted by the defendant needed to be restored to the class and given another opportunity to opt out. *Id.* at 722–23.

The court in *In re Federal Skywalk Cases*, 97 F.R.D. 370, 374 (W.D.Mo.1983) ("*Federal Skywalk Cases*") reached a similar result. After the federal court conditionally certified a voluntary class action and approved the form of notice, the defendants and the plaintiffs who were formerly designated as plaintiffs-intervenors (collectively "defendants") moved in state court for the conditional certification of a voluntary class action. The state court conditionally certified the voluntary class action, approved a form of notice and tentatively approved a class-wide settlement. Counsel appointed to represent the federal class were not given notice of the state court proceeding. The class conditionally certified by the state court encompassed *all* of the plaintiffs in the federal class action. *Id.*

Immediately after the state court conditionally certified the class, the parties who participated in the state action held a press conference. Moreover, a one-page notification regarding the state court class action appeared in a local newspaper and on that same day, two named representatives of the state court class action appeared on a nationally televised morning show. Shortly thereafter, the defendants commenced payments to state class plaintiffs under the terms of the state class settlement.

Following the media campaign, the federal court was inundated with inquiries from confused members of the federal class. An emergency hearing was conducted by the federal district court on the plaintiffs' motion to show cause why the defendants should not be held in contempt for unauthorized commu-

---

**49.** DR 7–104 of the Code then provided:
 (A) During the course of his representation of a client a lawyer shall not:
 (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
 (2) Give advice to a person who is not a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the client.
In *Impervious Paint Ind.*, counsel did not personally contact any class member. Rather, the court found impropriety because counsel had full knowledge of their client's intention to attempt to sabotage the class notice, and "in derogation of their duty as officers of the Court," they did not advise against it. *See Impervious Paint Ind.*, 508 F.Supp. at 723.

nication with absent class members. The court found that the public was utterly confused due to the defendants' conduct and that the defendants should be held in contempt for making unauthorized contact with members of the federal class action. *Id.* at 374–75.

In support of its finding of contempt, the district court concluded that the actions of the defendants in state court and in the local and national media ignored the attorney-client relationship between class counsel and class members established when the class was certified. As a result, the defendants violated Disciplinary Rule 7–104 of the Missouri Code of Professional Responsibility.[50] According to the court, the defendants deliberately attempted to evade the federal court's supervisory authority under Rule 23, violated Disciplinary Rule 7–104 and disrupted the entire Skywalk litigation.[51] *Id.* at 377.

Although the *Federal Skywalk Cases* occurred in the context of a civil contempt proceeding,[52] the case is still instructive because of the remedial action taken by the court to correct the disruption of the federal class litigation. Finding that "[t]he damage caused by the actions of the defendants and their agents [could not] be entirely undone," the court stated that it must take appropriate measures to satisfy itself that the opt-outs received after the state court conditionally certified the state class and approved a form of notice were based on complete information. *Id.* at 378. As a result, the court declared that all efforts to opt out of the federal class after the state court conditionally certified the class, whether reflected in opt-out certificates or releases purchased by the defendants for cash settlements, were void and of no effect. In addition, the court ordered the parties to propose a corrective notice to be sent to all identifiable class members. The notice was to include a summary of the developments in the litigation and a copy of the court's order. Moreover, class members were given one week from the filing of the corrective notice to inform the court of their desire to opt out of the federal class.[53]

In conclusion, the court stated that the remedy provided would permit those who opted out before the state court certified the state class to "rethink their decision and opt out again if desired." *Id.* at 378. The court then continued, "The remedy lessens some of the confusion which has arisen throughout the course of the skywalk litigation.... The Court simply intends by this order that any settlement be reached in accordance with Rule 23." *Id.*[54] Similarly, in the instant case, the remedy provided today focuses on the effects of the misleading communications on class members. It is remedial, not punitive, and is ordered for the sole purpose of ensuring that class members' decisions regarding exclusion are based upon complete and accurate information. *See Haffer,* 115 F.R.D. at 512 (where defendants distributed to class a misleading memorandum and made series of unauthorized contacts with class members, court ordered corrective notice to class); *Tedesco,* 629 F.Supp. at 1478–80 (ordering notice to class to correct materially

---

**50.** Disciplinary Rule 7–104 of the Missouri Code of Professional Responsibility was then the same as Disciplinary Rule 7–104 of the ABA Code of Professional Responsibility. *See supra* note 49.

**51.** The court also found that the defendants made misrepresentations to the state court by, *inter alia,* not informing it that (1) counsel to the federal class action were not notified of the proceeding, or (2) about the planned media blitz.

**52.** The court eventually vacated its order of contempt after the parties had reached a proposed settlement agreement. *See In re Federal Skywalk Cases,* 97 F.R.D. 380, 384 (W.D.Mo.1983). The court later redefined the class. *Id.*

**53.** Similarly, in *Sommers,* after the notice sent to all class members was surrounded by "innuendoes of undue influence by both sides which may or may not have caused an inordinate amount of 'opt-outs,'" the court redefined the class for settlement purposes by bringing back in the individuals who chose to exclude themselves from the class. 79 F.R.D. at 577 n. 4. The court found that this remedy did not offend the interest of due process because the individuals who originally opted out "were as free as they were before to request exclusion from the class." *Id.*

**54.** The court did not enter a default judgment against the defendants nor disqualify their counsel. The court did award the plaintiffs the attorneys' fees which they incurred in bringing the motion for contempt and in correcting the actions of the defendants. *Federal Skywalk Cases,* 97 F.R.D. at 378.

false and misleading letter sent to class by defendant); *Manual for Complex Litigation, Second,* § 30.24 (1985) ("If class members have received communications containing misinformation or misrepresentations, a curative notice from the court ... giving the correct information should be considered. Extensions of deadlines for opting out, intervening, or responding to a proposed settlement may also be needed."); Comment, "Restrictions on communication by class parties and attorneys," 1980 Duke L.J. 360, 382 (if misrepresentations in soliciting opt-outs occur, the court could insist that corrective notice is sent and "could require reaffirmation of the decision to opt out."); *Newberg on Class Actions* § 15.02, at 15–6 (3d ed. 1992) ("When the court finds that the class action has been abused to the potential prejudice of class members, the court has full power to take appropriate remedial action to avoid or minimize any prejudice to the class.").

The attempt by Elfenbaum to distinguish *Kleiner, Impervious Paint Ind., Federal Skywalk Cases,* and *Tedesco* on the basis that those cases involved improper communications by *defendants* who were in an undeniably adversarial position with respect to class members misses the mark. Elfenbaum argues that the defendants in those cases attempted to benefit by limiting their damage exposure. Elfenbaum concludes that because in the instant case the allegedly improper conduct involves outside plaintiffs' counsel whose interests are "coextensive" with those of class members, the cases are inapposite. I disagree.

First, as noted earlier, it is disingenuous to suggest to this Court that outside plaintiffs'

counsel conducted this campaign to solicit opt-outs only to protect the interests of class members. Simply, outside plaintiffs' counsel stand to benefit financially from additional opt-outs. The greater the number of individuals who opt out of the *Georgine* class, the greater opportunity for higher fees and the greater the chance for the occasional exorbitant verdict. *See* discussion *supra* part II. B.1(a). Moreover, as previously discussed, the interests of plaintiffs' counsel are not always aligned with those of class members. *See supra* note 25.

Second, and more importantly, the remedy here is intended to protect the class and is not grounded upon the motivations of the wrongdoers. The intentions of counsel for absent class members have little relevance to this Court's determination that these class members may have made a decision to opt out of the class based upon faulty information. Indeed, the remedy provided today is not intended to punish counsel for improper behavior. In the cases referred to by Elfenbaum, while the courts addressed the motivations of the defendants, those references were generally made in the context of discussing the punitive aspects of those cases. Conversely, the discussions regarding the effect of the wrongdoers' conduct on the class related to the remedial aspects of the courts' opinions, *i.e.*, ensuring that class members acted upon accurate information. Although the issue of attorney discipline was addressed in those cases, that fact does not undermine the usefulness of the cases referred to above.[55] *See Kleiner,* 102 F.R.D. at 772; *Impervious Paint Ind.,* 508 F.Supp. at 723–24.[56]

**55.** Moreover, I do not find the distinction between the party-status of the wrongdoers to be meaningful because the need for the remedy here is unaffected by the fact that the improper communications were made by outside plaintiffs' counsel as opposed to counsel representing party-defendants.

**56.** Elfenbaum asserts that under *Bellotti,* conduct of the state that gives one side of a debatable public question an advantage in expressing its views to the people is impermissible. Elfenbaum supp. memo. at 2. *See Organization for a Better Austin v. Keefe,* 402 U.S. 415, 418–19, 91 S.Ct. 1575, 1577–78, 29 L.Ed.2d 1 (1971) (communications that are intended to be coercive

does not remove them from the reach of First Amendment). Elfenbaum contends that *Bellotti* prevents this Court from remedying the effects of the misleading communications. Elfenbaum's argument is unpersuasive. First, the decision here does not give any one side an advantage to communicate its message. It only requires that communications to the class not be misleading. As stated earlier, individuals are welcome to share their opinions with class members. Second, *Bellotti* involved an attempt by a state to limit the topics to which corporations could "speak" relating to governmental affairs. 435 U.S. at 776, 777 n. 11, 98 S.Ct. at 1415–16, 1416 n. 11. Here, no such specific limitation on a type of speech exists. Third, *Bellotti* did not

Supported by case law and the power of this Court pursuant to Rule 23, I conclude that restoring to those individuals who have *filed* exclusion requests the opportunity to opt out is an adequate step toward remedying the effects of the misleading communications.[57]

### a. Content of notice

After examining and comparing the content of the settling parties' proposed Rule 23 notice (Dkt. No. 1305) and the original notice approved by this Court on October 27, 1993, I conclude that they are substantially similar. The only significant changes (1) explain that the proposed notice is directed only to those class members who filed timely exclusion requests during the first notice and opt-out period, and (2) update class members about the developments in this class action during the past year. As a result of the similarity between the proposed notice and the original Court-approved notice, I will not address objections that were similarly raised regarding the approval of the original notice in late 1993. *See Carlough,* 158 F.R.D. 314. Based upon the similarity between the original notice and the proposed notice, I conclude that the contents of the proposed notice materials satisfy the requirements of Fed.R.Civ.P. 23(c)(2) and 23(e) and the Due Process Clause of the Constitution. Moreover, because the new notice will be sent by first-class mail to each individual class member who originally filed a timely exclusion request, the plan for dissemination of the new notice satisfies Rule 23(c)(2) and, therefore, the requirements of due process. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174–75, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974).

Some Objectors argue that the new notice materials should not inform class members that this Court found the Stipulation of settlement to be fair to the class. They contend that "[t]he notice materials are clearly designed to create the impression in the mind of class members that the settlement is fair and that they were initially duped into excluding themselves from the class by greedy counsel who lied about the terms or effect of the settlement." Wiese supp. opp. at 5. I reject this argument. First, any attempt to withhold the fact that the fairness hearings were held and that this Court determined that the settlement is fair to the class as a whole would be an omission of a significant fact of this case. It would not be aboveboard for this Court to advise class members of their rights regarding this settlement without revealing to them that after a thorough examination of the relevant facts this Court has determined that the settlement is fair to the class. This Court is a neutral decisionmaker and as participants in this proceeding, class members have a right to know this Court's decisions that affect them. Second, any potential "coercive effect" from the reference to the August 16, 1994 decision is mitigated by the fact that the cover letter attached to the notice alerts class members that the August 16, 1994 decision will be subject to appeal and is not final. Third, this Court determined on August 16, 1994 that the terms of the Stipulation of settlement are fair "to the class as a whole." *See Georgine,* 157 F.R.D. at 337. The August 16, 1994 memorandum opinion and order could not, and does not, address how the settlement would impact each individual class member. Accordingly, there is no basis for the argument that disclosing this Court's finding of fairness would undercut any accurate communication or advice between counsel and their individual clients.

This Court has decided to include a copy of the August 16, 1994 memorandum opinion and order in the new notice materials in order to provide class members with a more complete exposure to some of the issues involved in this Court's fairness determination. The inclusion of the memorandum opinion and order will ensure that class members are

---

involve a class action and it addressed matters of great public concern, that is, expression relating to government. *Id.* Here, while the decision to opt out of the class is extremely significant, it does not rise to the level of the subject matter addressed in *Bellotti.*

57. This alternative does not offend due process because if class members did indeed wish to opt out of the class, they will be free to do so again. *See Sommers,* 79 F.R.D. at 577 n. 4; *see also Impervious Paint Ind.,* 508 F.Supp. at 724.

thoroughly informed of the basis for the general statement that the Court found the settlement to be fair to the class as a whole. Moreover, the impact of the general fairness statement is balanced by the cover letter attached to the notice materials which informs class members that there were substantial objections to the settlement during the course of the hearing and that class members should consider whether any of the objections applies to them. The cover letter also provides specific citations to places in the August 16, 1994 memorandum opinion where objections were addressed.[58] Finally, because the August 16, 1994 memorandum opinion and order are attached to the notice materials, and because the proposed notice materials repeatedly make reference to this Court's decision regarding the fairness of the Stipulation, I will order that the references to this Court's decision relating to the fairness of the settlement in part I.B on pages 6–7 and part I.D on page 8 of the proposed notice materials be omitted.[59]

Some Objectors argue that the statement in the cover letter and proposed notice that misleading and inaccurate communications with class members were created "by various asbestos plaintiffs' attorneys opposing the settlement" is "problematic". *See* Elfenbaum supp. opp. at 9.[60] These Objectors argue that the failure to enumerate which "opponents" or "misleading communications" were involved undercuts the advice of those who did not provide misleading communications. I also reject this argument. The

complete statement in the cover letter and notice packet explains that "while there were many communications by both attorneys who favor and those who oppose the settlement which were fair and accurate, there were a significant number of misleading and inaccurate communications with class members by various asbestos plaintiffs' attorneys opposing the settlement." This statement is accurate, not misleading, balanced, and informs class members that there were both accurate and inaccurate communications of counsel. Informing class members of the existence of both accurate and inaccurate information makes it likely that class members will not discount or dismiss *all* information they have heard regarding the *Georgine* settlement. If class members were to discount all advice relating to the settlement, they knowingly would be dismissing some information that likely was accurate. I find this result to be improbable. It is more conceivable that class members will be more careful and cautious when receiving information about this settlement in the future. That outcome is not unfavorable. Moreover, listing those individuals who disseminated or published misleading communications and the substance of them would be cumbersome and distracting for class members. Accordingly, I conclude that the contents of the attached cover letter and Exclusion Request form, the proposed notice and the inclusion of the August 16, 1994 memorandum opinion and order of this Court are fair and reasonable and satisfy the requirements of Rule 23.[61]

---

**58.** In response to the arguments of the Objectors and the settling parties, this Court has made significant changes to the proposed cover letter. The cover letter attached hereto now fairly meets the concerns of the parties.

**59.** The attached Order also makes some other minor changes to the proposed notice to ensure that class members receive an accurate and fair description of the findings and conclusions of this Court.

**60.** Although the Elfenbaum supplemental memorandum in opposition to the joint motion addresses concerns relating to the "disclosure statement" proposed by the settling parties, because the substance of that disclosure statement is similar to the contents of the cover letter attached hereto, the arguments are applicable here.

Moreover, this Court has considered all objections to the contents of the disclosure statement and proposed notice materials that have been filed since both documents were originally submitted to the Court in October and November of 1994.

**61.** The argument of Dearborn and Butcher that the notice must advise class members who may be affected by the Longshore and Harbor Workers' Compensation Act ("Longshore Act") of the ability of their employers to assert this settlement as a complete bar to the receipt of benefits is unavailing. As discussed in this Court's August 16, 1994 memorandum opinion, the approval of the Stipulation of settlement as fair does not constitute a "settlement" as contemplated by the Longshore Act and, therefore, would not affect the rights of employees covered by the Longshore Act. *See Georgine*, 157 F.R.D. at 332–33. This Court addressed this very issue back on August

## 2. First Amendment

As to the effect of this remedial device on the First Amendment, the settling parties and the Objectors have taken opposite views. The settling parties assert that the First Amendment is "irrelevant" to the decision of this Court to order a second notice and opt-out period for excluded class members. Apparently, the settling parties do not believe that voiding the opt-outs would "abridge" First Amendment rights of the speakers or receivers.[62] Relying mainly on this Court's duty under Rule 23 and the Due Process Clause to ensure that class members receive the "best notice practicable," the settling parties argue that this Court has authority to order this remedy without regard to the First Amendment.[63] Conversely, the Objectors contend that a second opt-out period which negates prior exclusion requests based upon the communications of counsel would trigger complete protection under the First Amendment and, therefore, would be impermissible under strict scrutiny. The Objectors argue that invalidating exclusion requests based upon the content of communications of counsel is a "sanction" or a punishment related to that expression and, therefore, is impermissible.[64] Moreover, they argue that such a sanction would impose a significant restriction on the First Amendment rights of class members to receive such protected information. *See Sechuan City, Inc. v. North American Motor Inns, Inc.,* 96 B.R. 37, 42 (E.D.Pa.Bankr.1989) (First Amendment implicated where protected speech is punished); *Kleiner,* 102 F.R.D. at

772 (permitting those who opted out based on the solicitation program of defendant to void their exclusion requests after judgment "has some aspects of a *penalty* ") (emphasis added).

■ The type of expression involved here, that is, advice regarding whether class members should opt out of a class, is entitled to some constitutional protections. *See In re Primus,* 436 U.S. 412, 432, 98 S.Ct. 1893, 1905, 56 L.Ed.2d 417 (1978); *United Transp. Union v. State Bar,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971) (although in context of associational rights, Court recognized importance of assistance in asserting legal rights); *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Bernard v. Gulf Oil Co.,* 619 F.2d 459, 471–72 (5th Cir.1980), *rev'd,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Rodgers v. United States Steel Corp.,* 508 F.2d 152, 162 (3d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975) (an order restricting communications with potential class members by the plaintiffs or their attorneys "certainly raises serious first amendment issues"); *Waldo v. Lakeshore Estates, Inc.,* 433 F.Supp. 782, 787 (E.D.La.1977), *appeal dismissed without op.,* 579 F.2d 642 (5th Cir.1978); *see also Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 637 n. 7, 105 S.Ct. 2265, 2274 n. 7, 85 L.Ed.2d 652 (1985); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 757, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (" 'freedom of

---

16, 1994 and rejected the need to include this information in the original notice materials. Moreover, Dearborn and Butcher have not brought any new facts to the attention of the Court that would require a different conclusion. *Id.* In any case, because a copy of the August 16, 1994 memorandum opinion and order will be included with the notice materials, those class members who potentially could be affected by the Longshore Act can read the relevant portions of the opinion that address this issue. *See id.*

**62.** The First Amendment provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**63.** The settling parties do not explain how both a federal rule of civil procedure and the Due Process Clause can negate the need to consider any impairment on the right to speak and receive. Although, as discussed *infra* note 74, Rule 23 may play a part in determining the standard by which to test the sufficiency of the First Amendment impairment here, the settling parties have not demonstrated how this Rule could supersede the need for First Amendment analysis.

**64.** The Objectors do not reveal whether their attorneys' rights to speech would be impinged by, *e.g.,* the negation of the effect of their speech, the potential undermining of their credibility, the potential chilling of expression, financial concerns, etc.

speech necessarily protects the right to receive' "). Governmental conduct that abridges First Amendment rights require careful analysis to determine if this conduct is permissible. "Abridgements" of speech have been described as "restrictions," "limitations," "impingements," "burdens," "substantial interferences" and "penalties." *Keene v. Meese*, 619 F.Supp. 1111, 1123 (E.D.Cal. 1985), *rev'd*, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). "As such, the question of possible abridgment is one of an evidentiary nature." *Id.*

 The Order here negating optouts does not constitute a prior restraint on communication, nor does it directly punish the speakers. However, "the fact that no direct restraint or punishment is imposed upon speech or assembly does not determine the free speech question." *American Comm. Ass'n v. Douds*, 339 U.S. 382, 402, 70 S.Ct. 674, 686, 94 L.Ed. 925 (1950). "Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes." *Id.; Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 255, 107 S.Ct. 616, 626, 93 L.Ed.2d 539 (1986) (fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize it as infringing upon First Amendment); *Meese v. Keene*, 481 U.S. 465,

490, 107 S.Ct. 1862, 1876, 95 L.Ed.2d 415 (1987) (Blackmun, J. dissenting in part) (labelling of appellee's films as "political propaganda" impermissibly inhibits protected expression and therefore creates an indirect burden on expression); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66–69, 83 S.Ct. 631, 637–39, 9 L.Ed.2d 584 (1963) (informal sanctions burden First Amendment rights even though they do not regulate, seize, ban, or criminally punish). Indeed, the Supreme Court has made clear that the government may not "produce a result which [it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). Such an interference with constitutional rights is impermissible. Appropriately then, government conduct that takes the form of a "penalty" or a "sanction" for the utterance of protected expression implicates the First Amendment.[65] *Id.* at 518, 78 S.Ct. at 1338 (statute exempting veterans from property taxes only if sign pledge promising not to advocate forcible overthrow of government is in effect a penalty for speech).[66] The question of whether a remedy penalizes speakers in a significant manner by negating the effectiveness of their communications, and thereby burdens First Amendment rights is of an evidentiary nature. Because the remedy here survives the highest level of constitutional scrutiny, it is not necessary to decide whether the impair-

---

**65.** This principle has been applied to the grant of governmental benefits. According to the Supreme Court,

> even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would *in effect be penalized* and inhibited.

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (emphasis added); *see FCC v. League of Women Voters*, 468 U.S. 364, 400–02, 104 S.Ct. 3106, 3128–29, 82 L.Ed.2d 278 (1984) (Congress created unconstitutional condition to the receipt of federal funds which was essentially a penalty to those stations

who sought to engage in constitutionally protected expression); *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) (denial of unemployment benefits because of refusal to accept employment on Saturdays is impermissible penalty under First Amendment); *McBee v. Jim Hogg County, Texas*, 730 F.2d 1009, 1011 (5th Cir.1984) (discharge of employee for protected expressions implicates First Amendment); *BullFrog Films, Inc. v. Wick*, 646 F.Supp. 492, 501 (C.D.Cal.1986), *aff'd*, 847 F.2d 502 (9th Cir.1988) (issue involved whether regulations imposed a sanction or penalty).

**66.** *See In re Primus*, 436 U.S. at 433, 98 S.Ct. at 1905 (sanction for violation of disciplinary rules implicates First Amendment); *Brandenburg v. Ohio*, 395 U.S. 444, 447–48, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969) (statute that criminally punished mere advocacy violated First Amendment); *New York Times Co. v. Sullivan*, 376 U.S. 254, 277, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964) (civil damage awards based on protected expression implicates First Amendment).

ment of the authors' or receivers' interests was so modest so as not to raise any First Amendment concerns at all. *See* discussion *infra* note 74; *Impervious Paint Ind.*, 508 F.Supp. at 723–24 (voiding opt-outs based upon prior communications with no discussion of First Amendment); *Federal Skywalk Cases*, 97 F.R.D. at 378 (same); *Sommers*, 79 F.R.D. at 577 n. 4 (same); *see also Meese*, 481 U.S. at 480, 107 S.Ct. at 1871 (Act does not burden First Amendment rights because "Congress did not prohibit, edit, or restrain the distribution of advocacy materials in an ostensible effort to protect the public from conversion, confusion or deceit."); *In re "Agent Orange" Product Liab. Litig.*, 689 F.Supp. 1250, 1261–62 (E.D.N.Y.1988) (no constitutional analysis when voiding opt-outs not based upon improper communications).

■■■■ The protection available for expression turns on the nature both of the expression and of the governmental interests served by its regulation. When governmental action implicates First Amendment rights, the Court must balance those interests against the governmental interest in limiting the activity in question. *Gulf Oil Co.*, 452 U.S. at 101–02, 101 S.Ct. at 2200–01; *Stretton v. Disciplinary Bd. of S.Ct.*, 944 F.2d 137, 141 (3d Cir.1991). "[S]uch a weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." [67] *Gulf Oil Co.* 452 U.S. at 102, 101 S.Ct. at 2201. As an initial matter, it is necessary to determine where on the spectrum of First Amendment values the communication here falls. *See Sechuan City, Inc.*, 96 B.R. at 42 n. 9; *Impervious Paint Ind.*, 508 F.Supp. at 723. "[N]ot all speech is of equal First Amendment importance." *Sechuan City, Inc.* 96 B.R. at 43 (finding posting of notices relating to bankruptcy to be private concern, war-

ranting no special First Amendment protection). *See also Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 762, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985) (petitioner's credit report is a private concern and warrants no special protection when it is false).

■■■■ The settling parties argue that the expression here constitutes commercial speech and, therefore, because it is misleading the expression is not entitled to any protection.[68] Commercial speech is defined as expression related solely to the economic interests of the speaker and its audience, generally in the form of a commercial advertisement for the sale of goods and services. *Central Hudson Gas & Electric Corp.*, 447 U.S. at 561, 100 S.Ct. at 2348–49; *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 933 (3d Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *Kleiner*, 751 F.2d at 1203 n. 22 ("Commercial speech consists of expression related largely or solely to the economic interests of the speaker and the audience."). "Commercial speech encompasses not merely direct invitations to trade, but also communications designed to advance business interests, exclusive of beliefs and ideas." *Id.* Moreover, the Supreme Court has recognized " 'the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.' " *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64–65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983).

■■■■ The Supreme Court has cited three factors for courts to consider when deciding whether speech is commercial: (1) is the speech in the form of an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an

---

**67.** While I recognize that *Gulf Oil Co.* involved an affirmative limitation on speech and that the relief here is only remedial in nature, the test that the Supreme Court established can be applied here. *See Speiser*, 357 U.S. at 518, 78 S.Ct. at 1338; *McBee*, 730 F.2d at 1011.

**68.** If the communications of counsel at issue amounted to speech of a commercial bent, this

Court's actions would not infringe upon the First Amendment because untruthful or misleading commercial speech "has no claim on first amendment immunity." *Kleiner*, 751 F.2d at 1204; *see Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980).

economic motivation for communicating with the audience. *Id.* at 66–67, 103 S.Ct. at 2880; *U.S. Healthcare, Inc.,* 898 F.2d at 933. An affirmative answer to all of these questions provides strong support for the conclusion that the particular expression is commercial in nature.

First, the majority of the misleading communications at issue are not advertisements. As to the second factor, the misleading communications here do not necessarily *refer to a specific product or service. See* settling parties' supp. memo. at 17. Most of these letters and advertisements, either explicitly or implicitly, likely were designed to remind the recipient to hire the lawyer or firm who was responsible for the advertisement or letter to handle any future claim for asbestos-related personal injuries. *See* settling parties' joint motion, exhibit 12 (*only* exhibit that does not request that author's firm be contacted). However, some of them were sent to clients who were already represented by the authors.[69] *See* certification of Colleran, O'Hara & Mills; certification of Rosenberg and Brookman at ¶ (a)(i); certification of Pyle and Higbee at ·¶ 3. In those instances, disseminating the letter likely was not motivated by a desire to sell services.[70] It also is possible that the authors sought to increase the number of opt-outs to demonstrate to the Court that the settlement was not fair or to cause the CCR defendants to withdraw from the settlement, rather than to sell a service. *See* discussion *supra* part II.B.1(a).[71] Simply, this is not a clear case of pure advertising of attorneys' services. *See* Elfenbaum supp. memo. at 18 n. 15 (pure lawyer advertising involves direct attempts to garner business); *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 469, 472, 108 S.Ct. 1916, 1919, 1921, 100 L.Ed.2d 475 (1988) (solicitation letter by attorney specifically inviting homeowners subject to foreclosure to call lawyer's office for free consultation is commercial speech); *Zauderer,* 471 U.S. at 629–31, 637 & n. 7, 105 S.Ct. at 2270–71, 2274 & n. 7 (lawyer's expression which specifically offered to represent victims of Dalkon Shield on a contingent fee basis was commercial speech despite inclusion of legal advice in advertisements); *U.S. Healthcare, Inc.,* 898 F.2d at 934 (advertisement campaign specifically referred to product over competing products); *but see Village of Schaumburg v. Citizens for Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826, 833–34, 63 L.Ed.2d 73 (1980) (solicitation by charitable organizations is so intertwined with informative speech seeking support for particular causes

**69.** Taken to its extreme, any communication between a lawyer and a client would be commercial in nature because it invariably would discuss issues which could require legal services in the future. Moreover, any communication that was written on a lawyer's stationary and provided her telephone number would "refer to a product or service." The settling parties have not proffered a case to support this broad interpretation of the *commercial speech doctrine.*

**70.** Citing to *Bolger,* the settling parties argue that even though speech may touch upon other subjects, if the communication attempts to sell a product or service, it can constitute commercial speech. *See Bolger,* 463 U.S. at 62–63, 103 S.Ct. at 2878 (informational pamphlets concerning the desirability and availability of prophylactics, in general and with respect to the speaker's specific product, can constitute commercial speech); *Board of Trustees v. Fox,* 492 U.S. 469, 473–75, 109 S.Ct. 3028, 3030–32, 106 L.Ed.2d 388 (1989) (speech at tupperware parties was commercial speech despite addressing other subjects such as how to be financially responsible and how to run an efficient home). I do not find that *Bolger* compels the conclusion that the expression here is commercial speech. First, while some of the pamphlets in *Bolger* were informational, it was still conceded that they were "advertisements." *Id.* 463 U.S. at 62 n. 4, 103 S.Ct. at 2878 n. 4. Second, *Bolger* and *Fox* involved products that were clearly being sold. In both cases, the comments on public issues clearly were made in the context of commercial transactions. *See Fox,* 492 U.S. at 473, 109 S.Ct. at 3030 ("There is no doubt that the AFS 'Tupperware parties' the students seek to hold 'propose a commercial transaction.'"). In the instant case, there has been no demonstration that the letters and advertisements primarily or solely proposed a commercial transaction. *See Zauderer,* 471 U.S. at 637, 105 S.Ct. at 2274.

**71.** This case does not involve a situation where a service is being referred to generically, in order to create new business for the individual drafter of the letters. *See Bolger,* 463 U.S. at 66 n. 13, 103 S.Ct. at 2880 n. 13. First, additional opt-outs could benefit asbestos plaintiffs' attorneys by creating larger fees from their *existing* clients. Second, there has been no showing that any of these attorneys has sufficient control of the legal market to enable him to promote his services without referring to his own name. *Id.*

or for particular views on economic, political, or social issues that does not constitute commercial speech); *Riley v. National Federation of Blind,* 487 U.S. 781, 796, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988) (refusing to apply one level of scrutiny to one phrase of professional fundraiser's solicitation and another level to the other phrase—must consider communication as a whole).

The third factor of the commercial speech test nearly supports the conclusion that the expression here constitutes commercial speech. The evidence suggests that the attorneys who drafted the letters and advertisements at issue had a *strong* pecuniary interest in obtaining as many opt-outs as possible. *See* discussion *supra* part II. B.1(a).[72] Over the past two years of observing various asbestos counsel, and after examining the overly zealous and misleading communications involved here, it is clear that the communications likely were created for financial gain. However, because the evidence in the record does not demonstrate the intentions of all of the authors involved, and because I recognize that it is possible that some attorneys were motivated solely by a desire to do what was in their clients' best interests, I cannot conclude with certainty that this factor weighs in favor of finding the expression here to be commercial in nature.[73]

Accordingly, even if the authors of the misleading communications at issue here had an economic motive for their "speech," the expression cannot be characterized as commercial speech. *See Bolger,* 463 U.S. at 67, 103 S.Ct. at 2880 ("Finally, the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech."). Most of the communications were not in the form of advertisements and some did not directly refer to a specific service. Moreover, some communications may have been intended to inform class members about their legal rights and, therefore, were not solely or largely related to the economic interests of the speaker and audience. Finally, applying the " 'commonsense' distinction between speech proposing a commercial transaction, ... and other varieties of speech," I cannot say with certainty, nor have the settling parties demonstrated, that the letters and advertisements advising class members to opt out of the *Georgine* class proposed a commercial transaction. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978); *see S.E.C. v. Wall Street Publishing Instit., Inc. ("Wall Street Publ."),* 851 F.2d 365, 372 (D.C.Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989); *see also Central Hudson Gas & Elec. Corp.,* 447 U.S. at 579, 100 S.Ct. at 2358 (commercial speech doctrine must not be defined too broadly "lest speech deserving of greater constitutional protection be inadvertently suppressed") (Stevens J. concurring); *In re Primus,* 436 U.S. at 438, 98 S.Ct. at 1908.

As the expression in the instant case does not propose a commercial transaction, the First Amendment interests involved are more significant than in the pure commercial context. The limitation on speech here is based upon the content of the communications relating to the provision of legal advice. As noted above, this type of expression implicates constitutionally-derived interests. *See In re Primus,* 436 U.S. at 432, 98 S.Ct. at 1904–05; *United Transp. Union,* 401 U.S. at 576, 91 S.Ct. at 1076; *Waldo,* 433 F.Supp. at 787; *cf. Cantwell v. Conn.,* 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940). To survive constitutional scrutiny, a content-based limitation on speech must

---

**72.** Furthermore, the misleading letters and advertisements were directed to the economic interests of the recipients as most of the communications emphasized that these class members would receive less money under the settlement than they would otherwise in another forum.

**73.** While Elfenbaum's supplemental memorandum admits that its firm, Kazan, McClain, Edises & Simon, had an economic interest in recovering more complete compensation, the affidavit of Steven Kazan states that his firm's "opposition to the *Georgine* settlement is based on [its] opinion and belief that *Georgine* unfairly compromises the rights and claims of these victims. [The firm] believes that it is [its] obligation to attempt to educate asbestos victims about the gross inadequacies of the proposed settlement in order to help them protect themselves and their families." Affidavit of Steven Kazan attached to the Elfenbaum supp. memo. at ¶ 5.

further a compelling interest and be narrowly tailored to serve that interest.[74] *See Zauderer,* 471 U.S. at 637 n. 7, 105 S.Ct. at 2274 n. 7; *In re Primus,* 436 U.S. at 432, 98 S.Ct. at 1905; *Virginia State Bd. of Pharmacy,* 425 U.S. at 757, 96 S.Ct. at 1823; *Waldo,* 433 F.Supp. at 787–88; *see also Speiser,* 357 U.S. at 518, 78 S.Ct. at 1338 (denial of benefit for engaging in constitutionally protected speech is penalty for that speech and, therefore, is a "limitation on free speech."). Assuming *arguendo* that the remedy here does impinge upon the First Amendment rights of the speakers or receivers, I find that this Court's interests are compelling and outweigh the interference of the competing First Amendment interests caused by this remedy and that the relief provided is narrowly tailored to achieve this Court's objectives.

I find that this Court has a compelling interest in remedying the effects of the misleading communications. Rule 23(c)(2) expressly provides that it is the court's responsibility to direct to the members of the class "the best notice practicable." Fed.R.Civ.P.

23(c)(2). Rule 23 requires that the notice contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class. *See In re Nissan,* 552 F.2d at 1105. Moreover, it is the duty of the court to "ensure that the notice 'apprise[ ] prospective [class] members of the terms of the Proposed Settlement, the identity of persons entitled to participate in it[,] and *the options that are open to the [class] members in connection with the proceedings.'"* Carlough,* 158 F.R.D. at 332 (quoting in part *In re Drexel Burnham Lambert Group, Inc.,* 130 B.R. 910, 924 (S.D.N.Y.1991), *aff'd,* 960 F.2d 285 (2d Cir.1992)) (emphasis added). The notice is intended to ensure that individuals may avoid being bound by a judgment that otherwise would preclude them from litigating their claims separately and courts have the responsibility to oversee that notice. *Waldo,* 433 F.Supp. at 790.

As discussed *supra,* the unauthorized communications attached as exhibits to the set-

---

**74.** Although there are many factors that warrant applying a less stringent standard in the instant case, I need not decide whether such a level applies because the remedy here meets the compelling interest standard. *Stretton,* 944 F.2d at 141 n. 1. Some of the factors favoring the application of a lower standard are: (1) the speech here does not implicate rights of political expression, civil rights, free association or mutual assistance in asserting legal rights. *See In re Primus,* 436 U.S. at 428, 431, 438 n. 32, 98 S.Ct. at 1902–03, 1904, 1908 n. 32; *United Transp. Union,* 401 U.S. 576, 91 S.Ct. 1076; *Gulf Oil Co.,* 619 F.2d at 472; *Rodgers,* 508 F.2d at 166 ("There is a distinction between litigation alleging violations of civil rights and a routine damage suit") (Weis J. concurring); (2) the speakers here had a *strong* pecuniary interest and it is unlikely that the remedy will discourage expression in the future; (3) the expression contained misrepresentations, false statements of fact and misleading communications of attorneys which are generally prohibited and regulated by many states' rules of ethics and do not implicate heightened First Amendment values. *See* ABA Model Rule of Professional Conduct 8.4; New York Code of Professional Responsibility DR 1–102(a), 2–101(a); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974); (4) the remedy involves the legitimate goal of a court controlling the attorneys practicing before it as the attorneys here likely represented class members or potential class members and their communi-

cations were directed at class members and were about the substance of this settlement. *See Gentile v. State Bar,* 501 U.S. 1030, 1071–72, 111 S.Ct. 2720, 2743, 115 L.Ed.2d 888 (1991); *In re Sawyer,* 360 U.S. 622, 646, 79 S.Ct. 1376, 1388, 3 L.Ed.2d 1473 (1959) (Stewart, J. concurring); (5) this Court requires broad discretion to issue remedial orders that will ensure that the class here receives accurate, fair and adequate notice. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 32–33 & n. 18, 36, 104 S.Ct. 2199, 2207 & n. 18, 2209, 81 L.Ed.2d 17 (1984); (6) the remedy provided here does not impair speech in the future, nor does it restrain the speakers from publicly protesting about the *Georgine* settlement. At most, it may cause counsel to provide accurate descriptions of the settlement in the future. *See SEC v. American Bd. of Trade, Inc.,* 830 F.2d 431, 442–13 (2d Cir.1987), *cert. denied, Economou v. SEC,* 485 U.S. 938, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988); *cf. Ohralik,* 436 U.S. at 456, 98 S.Ct. at 1918–19; (7) the impairment on First Amendment rights is tempered because the corrective notice ordered will not specifically name the authors of the misleading communications and it will state that there were both accurate and misleading communications. *See* discussion *supra* part II.B.2(à)1.a; and (8) this remedy does not impinge upon the class members' decisions to opt out of the class and the speakers are not being directly punished, fined, or disciplined. Moreover, this Court has not ordered class members to disregard or ignore the past or future communications of the authors.

**516**

tling parties' joint motion interfered with the careful balance that the notice package achieved and likely will prohibit a "free and unfettered" decision to opt out of the class. Given the susceptibility of nonparty class members to letters from counsel sent on official letterhead and expressing their professional judgment that class members should opt out of the class, these misleading communications likely were very effective. *See In re Sawyer*, 360 U.S. at 668, 79 S.Ct. at 1399 (Frankfurter, J. dissenting) "Considering the [likely] confusion resulting from notice that is less than complete in its terms, and the [likely] prejudice caused by notice less than accurate in its representations, effective management of the judicial process [will likely] be directly jeopardized. It is well-settled that courts may reasonably protect the integrity of their proceedings by limiting activities ordinarily protected by the First Amendment." [75] *Id.; see Commonwealth Ins. Co.*, 808 F.Supp. at 1203 ("One of the inherent powers of any federal court is the admission and supervision of the conduct of attorneys practicing before it.... Courts have vital interests in protecting the integrity of their judgments, maintaining public confidence in the integrity of the bar ...."); *see also In re Mitchell*, 901 F.2d at 1188.

In addition to the effect of the misleading communications on the *management* of the

judicial process, the misleading communications have a potential for confusion and likely will have a serious and imminent impact on the *administration* of justice. Because it is likely that class members were deceived, the danger is real, serious, likely and imminent that individuals have been induced to act to their detriment in reliance upon the misrepresentations, deceptive letters or blatant falsehoods of counsel. *See Waldo*, 433 F.Supp. at 791; *Tedesco*, 629 F.Supp. at 1484. "Thus entailed in this abuse is something more than a general interest in orderly process which is shared by the court and the public; there is the added interest of the individual [class member] in achieving a full and fair judicial remedy." [76] *Waldo*, 433 F.Supp. at 791. Free expression can be restricted where there is a reasonable likelihood that the individual's constitutional guarantee to a fair trial is jeopardized. *Waldo*, 433 F.Supp. at 791. The serious likelihood that a class member has excluded herself from the class and forfeited the opportunity to secure the benefits of the *Georgine* settlement without facts to make an informed choice undercuts the integrity of the Rule 23 process and the judiciary, generally. [77] This problem is of a great concern to this Court, the bar and the public at large. Accordingly, I find these interests to be compelling. [78]

**75.** This Court, counsel and the parties have all expended considerable resources formulating and litigating the content of the initial notice and have an interest in ensuring that these procedures were valuable and that the class receives adequate notice. Moreover, this Court and the public certainly have an interest in seeing that the remedy provided here is effective and that this issue does not continue to use any more of this Court's resources.

**76.** Moreover, because of the nature of this class action and the time and money expended by the CCR defendants, the CCR defendants have a right to have the proposed settlement accurately and fairly described to potential claimants.

**77.** Indeed, it would be a strange result if a state could regulate the conduct of an attorney who engages in conduct which involves misrepresentation and is prejudicial to the administration of justice, but a court could not take limited steps to correct the effects of that conduct on a class before it. *See* ABA Model Rule of Professional

Conduct 8.4; *cf. Lowe v. SEC*, 472 U.S. 181, 232, 105 S.Ct. 2557, 2584, 86 L.Ed.2d 130 (1985) (White, J. concurring); *Thomas v. Collins*, 323 U.S. 516, 547, 65 S.Ct. 315, 330, 89 L.Ed. 430 (1945) (Jackson, J. concurring).

**78.** I also find that voiding the exclusion requests and ordering a second opt-out period and notice furthers this compelling interest. If class members were misled into opting out of the class, restoring them to the class will provide them with another opportunity to decide whether to be bound by the settlement. Conversely, if a class member still desires to opt out of the class, then she can do so again. Moreover, because the new notice will include a statement informing class members that they may have been exposed to misleading communications disseminated by attorneys, class members during the second opt-out period will be on alert to review all letters and advertisements carefully. In addition, a Court-approved notice packet will be directly sent to each class member who originally opted out of the class to ensure that an accurate description of the settlement will be received.

I find that the remedy here is no greater than necessary or essential to further the governmental interests involved. *See Seattle Times Co.*, 467 U.S. at 32, 104 S.Ct. at 2207; *Rodgers*, 508 F.2d at 163 ("the interest of the judiciary in the proper administration of justice does not authorize any blanket exception to the first amendment"). While many broader remedies have been ordered by courts in similar circumstances, they are not necessary here. *See In re Domestic Air Transp. Antitrust Litig.*, 24 Fed.Rules Serv.3d at 517; *Haffer*, 115 F.R.D. at 513 (order prohibiting future improper communications); *Tedesco*, 629 F.Supp. at 1484, 1487 (same); *In re VMS Partnership Sec. Litig.*, 138 F.R.D. 102, 104–05 (N.D.Ill.1992) (requiring that communications to class members be submitted to the court); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 601–02 (2d Cir. 1986) (same); *Gulf Oil Co.*, 452 U.S. at 104 n. 20, 101 S.Ct. at 2202 n. 20 (suggesting that parties file copies of nonprivileged communications to class members with court). As noted previously, this remedy does not restrain or burden speech prior to its articulation. It has no connection with, nor seeks to restrict, any other public avenues of protest of the *Georgine* settlement and is only related to the communications at issue which were *directed* at members of the class in the action before me. This Court has not ordered class members to disregard or ignore the past or future communications of the authors.[79] In addition, the remedy does not impede the decision of class members to opt out of the class, if they desire to exclude themselves, they merely have to reaffirm their decision to opt out. For further discussion of the limited interference with the rights of the parties caused by this remedy, see *supra* note 74. Finally, as discussed *supra*, the remedy here does not require that all communications by asbestos plaintiffs' attorneys bear a disclosure statement as the settling parties have requested.

Furthermore, the notice packet does not specifically name those individuals who created the misleading communications and,

therefore, it will not interfere with the rights of the speakers. The corrective notice ordered will only state that while there were many communications by both attorneys who favor and those who oppose the settlement which were fair and accurate, there were a significant number of misleading and inaccurate communications with class members by various asbestos plaintiffs' attorneys opposing the settlement. The credibility of the authors of the misleading communications will be unimpaired as their names will not be disclosed and class members will be informed that asbestos plaintiffs' counsel had produced some communications that were fair and accurate. Accordingly, class members will not be left with the impression that all asbestos plaintiffs' counsel misled their class members. *See* discussion *supra* part II.B.2(a)1.a.

This remedy is narrowly tailored because there is no less drastic means for achieving the same basic purpose. *See Waldo*, 433 F.Supp. at 791. By voiding the opt-out requests and ordering the dissemination of notice materials, this Court will achieve its purpose of ensuring that those who opt out of the class intend to do so and exclude themselves based upon accurate information. As discussed in more detail in part II.B.2(a)1, I am not persuaded that the alternatives to this remedy suggested by the various Objectors would be more appropriate, effective or achieve the same purpose. Accordingly, because voiding the exclusion requests and permitting those who filed opt-out forms to reaffirm their decision is the most basic and effective means of achieving this Court's purpose which is to further compelling interests, and because these interests outweigh any potential interference with the First Amendment rights of the speakers or receivers here, this remedy satisfies the requirements under the First Amendment. Based upon my specific findings that the misleading communications at issue likely misled many class members into opting out of the class and after weighing the need for the remedy ordered against the potential interference with the rights of the parties, I conclude that the

---

79. Given the contentious nature of this litigation to date and the speakers' strong financial interest in the expression, I have no doubt that counsel will continue to advise class members regarding the considerations relevant to opting out of the class. The only difference may be that counsel will avoid misrepresenting facts and refrain from misleading class members.

remedy provided here is warranted. *See Gulf Oil Co.*, 452 U.S. at 101–02, 101 S.Ct. at 2200–01.[80]

### III. CONCLUSION

After a thorough examination of the letters and advertisements attached to the settling parties' joint motion, I have concluded that many of them were misleading. The communications contained inaccuracies, misstatements, misrepresentations or omissions that likely deceived class members into opting out of the *Georgine* class. Moreover, because the dissemination and/or publication of these communications was extensive, I have a grave concern that many class members were exposed to them and decided to opt out of the class based upon them. Accordingly, I have no other alternative than to provide class members who originally filed timely exclusion request forms with another opportunity to consider the relevant issues and to decide whether or not to exclude themselves from the *Georgine* class.

In making this decision, I recognize that some may say that this case has been litigated and analyzed *ad nauseam* and I am reluctant to prolong the entry of final judgment. However, under Rule 23 and the Due Process Clause, I have a duty to ensure that class members have the necessary facts to make an informed decision whether to exclude themselves from the class. Because I do not take this responsibility lightly, I will

take the necessary and appropriate action. Accordingly, for the foregoing reasons, the joint motion of the settling parties shall be granted in part and denied in part. The timely exclusion requests of class members shall be invalidated and a second opt-out period and notice shall be ordered.

An appropriate Order is attached.

### *ORDER*

**AND NOW**, this 28th day of February, 1995, upon consideration of the joint motion of the settling parties for an order establishing a second notice and opt-out period for class members who have requested exclusion from the class, etc. (Dkt. No. 807), and the responses of the various Objectors thereto, and for the reasons discussed in the attached memorandum, it is hereby **ORDERED** that the joint motion is **GRANTED** in part and **DENIED** in part. All timely exclusion requests [1] originally filed by individuals seeking to be excluded from the *Georgine* class are **HEREBY DECLARED VOID.**

**IT IS FURTHER ORDERED** that the settling parties shall make the following changes to the proposed notice materials filed by them on November 8, 1994 (Dkt. No. 1305):

1. the references to this Court's determination of the *fairness* of the settlement in part I.B on pages 6–7 and part I.D on

**80.** Indeed, in the context of a class action, the Supreme Court has noted that controls are sometimes needed, stating that, "[i]n the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel, witnesses, and jurors." *Gulf Oil Co.*, 452 U.S. at 100, 104 n. 21, 101 S.Ct. at 2200, 2202 n. 21 (recognizing that the rules of ethics impose restraints on some forms of expression in class action context). The Court of Appeals for the Third Circuit has recognized that in the Rule 23 setting, in the period following class action determination, the court has "undoubted power" to impose some restrictions on First Amendment rights during the course of judicial proceedings. *Rodgers*, 508 F.2d at 162. Restraints under Rule 23 are permissible in certain circumstances. *See Kleiner*, 751 F.2d at 1205 n. 25; *In re Domestic Air Trans. Antitrust Litig.*, 24 Fed. Rules Serv.3d at 516–17 (imposing serious restraints on speech of third party who offered information about proposed settlement); *Jack Faucett Assoc.*, 1985 WL 25746, at *7–*8; *Erhardt*, 629 F.2d at 845

(district court enjoined further communications with class members except upon prior approval of court); *Haffer*, 115 F.R.D. at 513 (in Rule 23 context, order prohibiting future improper communications valid during litigation); *Tedesco*, 629 F.Supp. at 1484 (restraining further communications by defendant-attorney was valid because court's interest in proper conduct of class action was substantial); *Federal Skywalk Cases*, 97 F.R.D. at 378; *but see Rodgers*, 508 F.2d at 163 ("Whatever may be the limits of a court's powers in this respect, it seems clear that they diminish in strength as the expressions and associations sought to be controlled move from the courtroom to the outside world.").

**1.** A timely exclusion request is a document, signed by an individual class member, postmarked on or before January 24, 1994, which provided a reasonable indication of the individual's desire to opt out.

page 8 of the proposed notice materials should be omitted;

2. paragraph four (4) on page 2 and the first paragraph of part II on page 10 should read:

This Court has determined that, during the first notice and opt-out period—from November 1, 1993 through January 24, 1994—while there were many communications by both attorneys who favor and those who oppose the settlement which were fair and accurate, there were a significant number of misleading and inaccurate communications with class members by various asbestos plaintiffs' attorneys opposing the settlement. These communications, which included both direct mailings and advertisements, urged class members to file forms excluding themselves from the class. These communications were not authorized by the Court and the Court has found that they are likely to have influenced many decisions to file an exclusion form;

3. paragraph seven (7) on page 3 should read:

Before deciding whether or not to exclude yourself from this class action, you should read this Notice carefully. You may wish to read the enclosed copy of this Court's August 16, 1994 decision and/or seek guidance from other advisors including the class attorneys or any other attorney;

4. The first sentence of paragraph thirteen (13) on page 19 and of paragraph eighteen (18) on page A–12 should state that "... Additional Class Counsel, David S. Shrager, Esquire, of Philadelphia, Pennsylvania, an experienced plaintiffs' personal injury attorney has been appointed by the Court, and a representative of the AFL–CIO ..." Each additional reference to "Additional Class Counsel" shall state "Additional Class Counsel, Mr. Shrager,";

5. paragraph sixteen (16) on page 20 and paragraph twenty (20) on page A–13 should read:

The CCR began processing claims for payment under the Settlement as of January 25, 1994. Operations under the Settlement will end and the CCR defendants will stop processing and paying claims, however, if certain insurance conditions are not satisfied, or if the Court's decision approving the Settlement is overturned by another court on appeal. Stipulation, Part XXVII, at pp. 102–03;

6. all references to this Court's August 16, 1994 decision regarding the fairness of the Stipulation of settlement should state that the settlement was approved as "fair to the class as a whole".

**IT IS FURTHER ORDERED** that the new notice packet shall consist of the (1) attached cover letter, (2) attached Exclusion Request form, (3) integrated notice materials which consists of the proposed notice materials filed by the settling parties on November 8, 1994 (Dkt. No. 1305) and includes the changes ordered herein, and (4) a copy of the August 16, 1994 memorandum opinion and order of this Court. The settling parties shall, no later than Friday, March 10, 1995, file and serve on counsel of record, a copy to this Court in Chambers, a new notice packet.

**IT IS FURTHER ORDERED** that the settling parties shall, no later than Monday, April 3, 1995, send by first-class mail of the United States Postal Service to each individual class member who originally filed a timely exclusion request, addressed to the location contained on the respective exclusion requests, a new notice packet.[2] These class members shall have until the close of business on Friday, May 5, 1995 to exclude themselves from the class if they so choose.[3] Only exclusion requests postmarked or filed

---

2. If the notice packet is returned without delivery by the postal service, the settling parties shall undertake a reasonable investigation to locate the whereabouts of the class member and to see to the delivery of the notice packet.

3. Pursuant to this Court's orders of January 11, 1994 (Dkt. No. 618) and January 13, 1994 (Dkt. No. 626), counsel are not permitted to opt out of this class action on behalf of their clients, so individuals must sign the exclusion request form personally or the form will be considered to be invalid.

with the Court no later than Friday, May 5, 1995 and received will be deemed to have met the aforesaid deadline.

**IT IS FURTHER ORDERED** that the settling parties shall, no later than Friday, June 30, 1995 (unless extended by the Court), file under seal a report to the Court containing the following: (1) a list of the names and addresses of all individuals to whom individual new notice packets were mailed; (2) a list of the names and addresses of those individuals to whom a new notice packet was mailed and not returned; (3) a list of the names and addresses of individuals to whom a new notice packet was mailed, but returned to sender and a brief statement of the efforts undertaken to notify the individual of the right to opt out; and (4) a list of the names and addresses of those individuals who filed a new exclusion request.

**IT IS FURTHER ORDERED** that the settling parties will obtain a post office box in the name of the Clerk of Court for receiving exclusion requests from class members. The box will be checked on a daily basis, and the settling parties will maintain a list and copies of all exclusion requests received.

### APPENDIX

United States District Court
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

*Dear Class Member:*

This letter is written at the direction of the Court.

This Court is presently handling the asbestos class action and settlement in *Georgine* (formerly *Carlough*) v. *Amchem Products, Inc.*, C.A. 93–CV–0215 (E.D.Pa.). In late 1993, this Court ordered that notice concerning this class action and settlement be given to class members. Any class member who wished to be excluded from the class had to file an exclusion request with this Court by January 24, 1994. According to our records, *you* filed such an exclusion request.

This Court has now determined that, during the first notice and opt-out period—from November 1, 1993 through January 24, 1994—while there were many communications by both attorneys who favor and those who oppose the settlement which were fair and accurate, there were a significant number of misleading and inaccurate communications with class members by various asbestos plaintiffs' attorneys opposing the settlement. These communications, which included both direct mailings and advertisements, urged class members to file forms excluding themselves from the class. These communications were not authorized by the Court and the Court has found that they are likely to have influenced many decisions to file exclusion requests.

Because of these faulty communications to class members, this Court has ordered that the original exclusion requests are all void, and has ordered a second notice and opt-out period for class members who filed those exclusion requests. Accordingly, *you* must file a second exclusion request if you still want to be excluded from this class action and settlement.

You should also note that, based on testimony of witnesses and submissions in a lengthy fairness hearing, this Court approved the settlement as fair and reasonable to the class as a whole. A copy of the Court's August 16, 1994 memorandum opinion and order is enclosed with these notice materials. This decision will be subject to appeal and is not final. You should also note that there were substantial objections to the settlement during the course of the hearing. The memorandum opinion describes many of these objections and you should read them and decide whether any of them applies to your individual circumstances.[1] You should consider these objections as well as the Court's

---

1. Please note the following portions of this Court's memorandum opinion of August 16, 1994 addressing some of the important objections to the settlement considered by the Court. *See* findings of fact numbered 48, 59–62, 65–67, 71–79 & note 20, 81–88, 95–100, 106, 107 & note 26, 108–114, 132–135, 144, 171–176, 200–207,

213, 229–233, 234–245, 247–282, 283, 284–300; and conclusions of law numbered 21–23, 51–56, 64–84, 85–89, 90, 91, 94–100, and exhibit B (compensation schedule).

While the objections are analyzed in a manner which supports their rejection by the Court, you are entitled to reach your own conclusions to the

approval of the settlement in making your decision of whether or not to request exclusion from the class.

Also enclosed are the new Court-approved accurate notice materials explaining this class action and the settlement. You should read all of these materials carefully before deciding how to proceed.

If, after reading the enclosed materials, you decide that you wish to *remain in the class,* you need to *do nothing* more at this time. On the other hand, if you decide that you still *wish to exclude yourself* from the class, you should *fill out, sign, and send the Exclusion Request form* included in the enclosed notice packet to the Clerk of the Court, c/o P.O. Box xxxx, Philadelphia, Pennsylvania 19107. To be effective, the exclusion request must be *postmarked no later than Friday, May 5, 1995* and signed by *you.* The Court has ordered that attorneys are not permitted to exclude their clients from the class, therefore, individuals must sign the exclusion forms personally or the forms will be considered to be invalid.

If you have any questions about this letter, the enclosed notice materials, or this class action and settlement, you should contact your own attorney, or the Court-appointed attorney for the class. Class counsel's names and addresses are included in the enclosed notice materials.

Sincerely,
Michael E. Kunz
Clerk, United States District Court
Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

Date: xxxxx

### EXCLUSION REQUEST

*READ THE ATTACHED LEGAL NOTICE*

*CAREFULLY BEFORE FILLING OUT THE FORM BELOW*

*If you want to exclude yourself from the class,* you must fill in all the items requested

contrary after mature reflection and after reading the notice packet and seeking guidance from

on the form below and return the form no later than *Friday, May 5, 1995* to:

Clerk of the Court
c/o P.O. Box xxxxx
Philadelphia, PA 19107

A *separate* request for exclusion should be completed and timely mailed for *each person* electing to be excluded from the class.

**If you wish to remain a member of the class, do *not* fill out and mail the form below.**

------------------------------------------------------------

The undersigned class member *does not* want to remain a member of the class certified in the case of *Georgine (formerly Carlough) et al. v. Amchem Products, Inc. et al.,* No. 93–CV–0215, pending in the United States District Court for the Eastern District of Pennsylvania.

1. _____

Unless class member is deceased, class member seeking exclusion must sign. The signature of an attorney on behalf of the class member is not permissible unless the attorney is officially appointed as a fiduciary of a deceased class member. (Please see number 6 below).

2. _____

Print name of class member seeking exclusion (Last name, first name, middle initial)

3. _____

Number & street

_____

City

_____

State & zip code
Print address of class member seeking exclusion

4. _____

Print date of birth of class member seeking exclusion

5. _____

other advisors including the class attorneys or any other attorney, if desired.

Print social security number of class member seeking exclusion

6. If the person signing this Exclusion Request is not the class member seeking exclusion, under what official authority do you sign this Exclusion Request for the class member listed? (*E.g.*, executor of estate, personal representative of estate, administrator of estate)

7. Brief description of basis for class membership (that is, facts concerning class member's occupational exposure to asbestos such as occupation, how exposed to asbestos, jobsite, and years at jobsite)